50

<u>PURCHASE AND SALE AGREEMENT</u>                         **EXHIBIT 5**

==**THIS PURCHASE AND SALE AGREEMENT** (this "<u>Agreement</u>") dated _____, 2020 is entered into by and between _____, of legal age, married, and residents of Dorado (the "<u>Seller</u>") and== <u>Hyung Soon Lee, married (pending divorce proceedings in NY State) and resident of Dorado, Puerto Rico</u> ("<u>Purchaser</u>"). Each a "Party" and collectively the "Parties".

### WITNESSETH

**WHEREAS**, Seller is the owner in fee simple ("*pleno dominio*") of the real property more particularly described in <u>Exhibit A</u> attached hereto and made to form a part hereof (the "<u>Real Property</u>");

**WHEREAS**, Seller has agreed to sell the Property (as such term is hereinafter defined) to Purchaser and Purchaser has agreed to purchase the Property from Seller, on the terms and conditions hereinafter provided;

**NOW, THEREFORE**, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged by the parties, the parties hereto, intending to be legally bound, hereby agree as follows:

1. <u>Purchase and Sale of Property</u>.
   a. **Purchase and Sale.** Subject to the terms and conditions set forth in this Agreement, on the Closing Date (as such term is hereinafter defined) Seller shall sell, transfer and convey the Property to Purchaser and Purchaser shall purchase, acquire and accept the Property from Seller, together with all its rights, easements, servitudes, accesses, privileges, structures, buildings and appurtenances without any limitation whatsoever, free and clear of all tenancies, liens, encumbrances, mortgages, options, claims, litigation, judgments, rights of third parties and other restrictions or limitations affecting the ability to use or transfer, with the exception of the liens, encumbrances and restrictions more particularly described in <u>Exhibit B</u> attached hereto and made to form a part hereof (collectively, the "<u>Permitted Encumbrances</u>").
   b. **Personal Property.** The purchase and sale of the Property includes all the fixtures, equipment and appurtenances listed and described in <u>Exhibit C</u> attached hereto and made to form a part hereof (collectively, the "<u>Personal Property</u>"; and together with the Real Property, hereinafter referred to as the "<u>Property</u>". All personal property not included in the purchase and sale of the Property shall be removed from the Property by Seller on or before the Closing Date. Seller can request in writing an additional 30 days to remove all personal property if necessary.
   c. **As-Is Sale.** Purchaser hereby agrees that to the maximum extent permitted by applicable law, the purchase and sale of the Property is made and shall be made without recourse on Seller or representation or warranty of any kind (whether express, implied or statutory) by Seller. The purchase and sale of the Property shall be on an "AS IS, WHERE IS" basis, with all faults and without any representation or warranty (all of which Seller hereby disclaims), provided, however, that nothing in this Section 1(c) shall excuse the Seller from its express obligation to convey the Property to the Purchaser with title complying with the provisions of this Agreement and the Seller shall assume and undertake the statutory warranty of title ("saneamiento por evicción") set forth in Article 1363(1) of the Puerto Rico Civil Code, codified in 31 L.P.R.A. § 3831(1), with respect to the sale of the Property.
   d. **Possession of the Property.** Unless otherwise agreed to by the parties, Purchaser shall take possession of the Property on the Closing Date. Seller agrees to vacate the Property on or prior to the Closing Date, unless agreed upon both parties for the completion of the removal of all personal property with a maximum of an additional 30 days.

2. <u>Purchase Price</u>.
   a. **Purchase Price.** The purchase price for the Property shall be **THREE MILLION SEVEN HUNDRED AND FIFTY THOUSAND DOLLARS ($3,750,000)** (the "<u>Purchase Price</u>").
   b. **Payment of Purchase Price.** The Purchase Price shall be payable to Seller by Purchaser as follows:
      i. **Earnest Money Deposit.** On the date of execution of this Agreement, Purchaser shall deliver to Seller a deposit of **TWO HUNDRED THOUSAND DOLLARS ($200,000.00)** (the "<u>Earnest Money Deposit</u>") in immediately available funds which shall be held in escrow by The Title Security Group, LLC ("<u>Escrow Agent</u>") in its escrow account (the "<u>Escrow Account</u>") pursuant to that certain escrow agreement to be executed by and between the Escrow Agent, the Seller and the Purchaser (the "Escrow Agreement") until the Closing Date or the date of any

[ ][ ] Seller's Initials          [ ][ ] Purchaser's Initials                                1

51

  early termination of this Agreement. The Earnest Money Deposit shall be applied to the Purchase Price on the Closing Date. In the event that the Purchaser notifies in writing to the Seller and to the Escrow Agent that it shall not acquire the Property as provided in Section 13(c) before the expiration of the Inspection Period (as defined below), then the Deposit shall be fully reimbursed by the Escrow Agent to the Purchaser immediately and without delay and without penalty, deduction or withholding of any kind, whereupon the parties hereto shall henceforth be released from any further liability or obligation to each other and this Agreement shall terminate. Seller and Purchaser hereby acknowledge and agree that interest shall not accumulate or be payable on any amounts held by the Escrow Agent in connection with any Earnest Money Deposit or otherwise.

  ii. **Balance of Purchase Price.** Purchaser shall pay the balance of the Purchase Price to Seller in immediately available funds on the Closing Date.

3. **Transaction Documents.** At Closing, Seller and Purchaser shall execute, as applicable, (i) a Deed of Purchase and Sale, <u>in form and substance acceptable to the undersigned parties,</u> pursuant to which Seller conveys, transfers and sells to Purchaser fee simple title to the Property (the "<u>Deed of Purchase and Sale</u>"); (ii) any deeds, instruments and documents necessary for the cancellation and/or release of record of any liens and encumbrances on the Property, other than the Permitted Encumbrances; and (iii) any other such deeds, instruments and documents as shall be necessary and appropriate to transfer and convey to Purchaser all of Seller's right, title and interest in and to the Real Property and the Personal Property, free and clear of all tenancies, liens, encumbrances, mortgages, options, claims, litigation, judgments, rights of third parties and other restrictions or limitations affecting the ability to use or transfer, other than the Permitted Encumbrances (collectively, the "<u>Transaction Documents</u>").

4. **Representations and Warranties of Seller.** Seller represents and warrants to Purchaser that:
   a. **Title to the Property.** Title to the Property is good, marketable and recordable in fee simple ("*pleno dominio*"), free and clear of all tenancies, liens, encumbrances, mortgages, options, claims, litigation, judgments, rights of third parties and other restrictions or limitations affecting the ability to use or transfer, with the exception of the Permitted Encumbrances.
   b. **Execution and Delivery.** This Agreement constitutes a legal, valid and binding obligation of Seller enforceable in accordance with its terms subject, as to the enforcement of remedies, to applicable bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally from time to time in effect. The Seller has the full legal right, power and authority to execute and deliver this Agreement and all documents now or hereafter to be executed by the Seller pursuant to this Agreement, including, but not limited to, the Escrow Agreement (as such term is defined below) and the Deed of Purchase and Sale (as such term is defined below) (collectively, the "Seller's Documents"), to consummate the transaction contemplated hereby and thereby, and to perform its obligations hereunder and under the Seller's Documents.
   c. **Approvals and Consents.** No approval, authorization, consent or other order or action of or filing with any court, administrative agency or other governmental authority is required for the execution and delivery of this Agreement or the consummation of the transactions contemplated herein.
   d. **No Other Agreements.** Except for this Agreement, no other document or instrument relating to the sale, lease, development or disposition of the Property is in effect.
   e. **Absence of Litigation.** No action, suit, proceeding or investigation by or before any court, administrative agency or other governmental authority involving Seller has been threatened or instituted which could restrain, prohibit or invalidate any of the transactions contemplated by this Agreement, nor is there any pending notification to Seller of any violation of law issued by any administrative agency or other governmental authority in connection with the Property.
   f. **No Contravention.** This Agreement and the Seller's Documents do not and will not contravene any judgment, order, decree, writ or injunction issued against the Seller, or any provision of any laws or governmental ordinances, rules, regulations, orders or requirements (collectively, "Laws") applicable to the Seller. The consummation of the transactions contemplated hereby and by the Seller's Documents will not result in a breach of, or constitute a default or event of default by the Seller under, any agreement to which the Seller or any of its assets are subject or bound and will not result in a violation of any laws applicable to the Seller.
   g. **Environmental.** The Seller has not caused or knowingly permitted any Hazardous Material to be placed, held, located or disposed of on, under or at the Property and, to the Seller's knowledge, there does not exist upon the Property any Hazardous Material. For purposes of this Agreement, "Hazardous Materials" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form,

lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls. For purposes of this Agreement, Environmental Laws shall mean any applicable law, and any governmental order or binding agreement with any governmental authority: (i) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (ii) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq..

5. **Representations and Warranties of Purchaser.** Purchaser represents and warrants to Seller that:
   a. **Execution and Delivery.** This Agreement constitutes a legal, valid and binding obligation of Purchaser enforceable in accordance with its terms subject, as to the enforcement of remedies, to applicable bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally from time to time in effect. The Purchaser has the full legal right, power and authority to execute and deliver this Agreement and all documents now or hereafter to be executed by the Purchaser pursuant to this Agreement, including, but not limited to, the Escrow Agreement (as such term is defined below) and the Deed of Purchase and Sale (as such term is defined below) (collectively, the "Purchaser's Documents"), to consummate the transaction contemplated hereby and thereby, and to perform its obligations hereunder and under the Purchaser's Documents.
   b. **Approvals and Consents.** No approval, authorization, consent or other order or action of or filing with any court, administrative agency or other governmental authority is required for the execution and delivery of this Agreement or the consummation of the transactions contemplated herein.
   c. **Absence of Litigation.** No action, suit, proceeding or investigation by or before any court, administrative agency or other governmental authority involving Purchaser has been threatened or instituted which could restrain, prohibit or invalidate any of the transactions contemplated by this Agreement.
   d. **No Contravention.** This Agreement and the Purchaser's Documents do not and will not contravene any judgment, order, decree, writ or injunction issued against the Purchaser, or any provision of any laws or governmental ordinances, rules, regulations, orders or requirements (collectively, "Laws") applicable to the Purchaser. The consummation of the transactions contemplated hereby and by the Purchaser's Documents will not result in a breach of, or constitute a default or event of default by the Purchaser under, any agreement to which the Purchaser or any of its assets are subject or bound and will not result in a violation of any laws applicable to the Purchaser.

6. **Covenants.**
   a. **Seller Covenants.** Seller covenants and agrees that:
      i. **No New Liens.** From and after the date of this Agreement and through the Closing Date, Seller shall not constitute, create or permit to exist upon the Property any tenancies, liens, encumbrances, mortgages, easements, restrictions, litigation, judgments, claims, options and rights of third parties, other than the Permitted Encumbrances and any mortgages existing as of the date of execution of this Agreement.
      ii. **Cancellation of Liens, Encumbrances and Mortgages.** On or before the Closing Date, Seller shall pay in full and cause the cancellation and/or release of any and all liens, encumbrances and mortgages on the Property, other than the Permitted Encumbrances.
      iii. **Real Property Taxes and Assessments.** All real property taxes and other assessments of any kind and nature due and payable (including interest and penalties thereon) with respect to the Property (the "Real Property Taxes and Assessments") corresponding to the period prior to the Closing Date shall have been paid in full by Seller on or prior to the Closing Date. Effective as of the Closing Date, Purchaser shall be defended, indemnified and held harmless by Seller from all real property taxes and assessments, penalties, interest and surcharges and costs and expenses assessed against the Property corresponding up to the period prior to the Closing Date.

[ ][ ] Seller's Initials         [ ][ ] Purchaser's Initials                                      3

                                                                                                                                                                                                                                          53

    iv. **Utilities and Maintenance Charges.** All utility charges, including, but not limited to, water, sewerage, electricity, gas, telephone, internet and cable television service charges (collectively, the "<u>Utility Charges</u>") and any maintenance charges and fees (collectively, the "<u>Maintenance Charges</u>") with respect to the Property corresponding to the period prior to the Closing Date shall have been paid in full by Seller on or prior to the Closing Date. Effective as of the Closing Date, Purchaser shall be defended, indemnified and held harmless by Seller from all Utility Charges and any Maintenance Charges, including, but not limited to, any penalties, interest and surcharges and costs and expenses, with respect to the Property corresponding up to the period prior to the Closing Date.

    v. **Homeowners Association Assessments.** All ordinary, base, special or specific assessments of any kind and nature (collectively, the "<u>HOA Assessments</u>") declared and imposed by the community where the Property is located (the "<u>Community</u>") with respect to the Property corresponding to the period prior to the Closing Date shall have been paid in full by Seller on or prior to the Closing Date. Effective as of the Closing Date, Purchaser shall be defended, indemnified and held harmless by Seller from all HOA Assessments, including, but not limited to, any penalties, interest and surcharges and costs and expenses, with respect to the Property corresponding up to the period prior to the Closing Date.

    vi. **Insurance.** The Property shall be insured by Seller up to the Closing Date. Any insurance premiums with respect to the Property corresponding to the period prior to the Closing Date shall have been paid in full by Seller on or prior to the Closing Date.

    vii. **Inspection and Due Diligence.** Purchaser shall have an inspection and due diligence period of (25) days commencing on the date of this Agreement (the "Inspection Period"). During the Inspection Period, the Purchaser may make such inspections of the Property as it deems necessary or advisable in order to decide if the Property is acceptable or adequate for the Purchaser to acquire (or not), including, without limitation, investigations as to title, zoning and permitted uses, physical condition, environmental assessments (including but not limited to lead and asbestos studies) and property tax verifications, to ensure that no undue or adverse restrictions or limitations apply to the Purchaser's intended use of the Property. Purchase may, at Purchaser's sole cost and expense, have any experts and professionals chosen by Purchaser to conduct any on-site inspections of the Property, including a survey on the Property, and review the status of title to the Real Property. Purchaser shall coordinate all on-site inspections in advance with Seller's Agent.

    viii. **Improvements and Alterations.** Unless otherwise agreed to by the parties, from and after the date of this Agreement and through the Closing Date, Seller shall not perform any improvements; alterations or additions to the Property other than maintain the property in good condition.

    ix. **Replacement or Substitution of Personal Property.** Unless otherwise agreed to by the parties, from and after the date of this Agreement and through the Closing Date, Seller shall not replace or substitute any of the Personal Property to be purchased by Purchaser.

    x. **Preparation of Deed of Purchase and Sale.** Seller agrees to provide all the documentation necessary for the preparation of the Deed of Purchase and Sale.

  b. **Purchaser Covenants.** Purchaser covenants and agrees that:

    i. **Availability of Funds or Financing for Purchase.** Purchaser shall deliver evidence to Seller of (1) the availability of funds for the purchase and sale transaction contemplated herein; or (2) a letter from a financing institution certifying that Purchaser has been pre-approved or pre-qualified for a mortgage loan, no later than five (5) days from the date of execution of this Agreement.

    ii. **Financing.** No financing contingencies will apply in this transaction. The Purchaser has the purchasing capacity.

    iii. **Appraisal:** No appraisal contingencies will apply in this transaction.

7. **Lead-Based Paint Disclosure.** Federal law mandates that sellers of residential property constructed prior to nineteen seventy-eight (1978) must complete certain lead-based paint disclosure requirements. Such disclosure requirements should be completed before a purchaser makes an offer and before a seller accepts a purchase offer, otherwise a purchaser may not be obligated under any purchase and sale agreement. A seller of any residential property is required to provide a purchaser with any information on lead-based paint hazards from risk assessments or inspections in a seller's possession and notify a purchaser of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase. The Property was constructed in the year [____]. If the Property was constructed prior to nineteen seventy-eight (1978), Seller and Purchaser shall execute the Lead-Based Paint Disclosure Form attached hereto as **Exhibit D** and made to form a part hereof.

[ ][ ] Seller's Initials          [ ][ ] Purchaser's Initials                         4

8. **Closing.** The consummation of the purchase and sale contemplated herein (the "Closing") shall take place at a mutually agreeable date, but no later than November 23rd, 2020 (the "Closing Date"). On the Closing Date, the parties shall execute the Deed of Purchase and Sale, as well as such other documents, agreements, assignments and public instruments pursuant to which fee simple ("pleno dominio") title to the Property shall be conveyed by the Seller to the Purchaser, free and clear of any and all property tax debts and assessments, mortgages, liens and encumbrances, except for the Permitted Encumbrances. Both, Seller and Purchaser, must put all reasonable efforts on working together and cooperate to speed up the transaction. It is understood and accepted by both parties involved that unforeseen events could happen and delay the transaction. If the Deed of Purchase and Sale cannot be signed under the stipulated time (the **"Option Term**), for reasons non-attributable to the PURCHASER and/or the SELLER, the option to purchase will be granted another 15 days by written agreement between the parties.

9. **Closing Deliveries of Seller.** At Closing, Seller shall tender to Purchaser each of the following:
    a. The Transaction Documents.
    b. Negative tax certificates from the Puerto Rico Municipal Tax Collection Center, the Puerto Rico Department of the Treasury and any other applicable government agencies certifying that the Real Property Taxes and Assessments assessed and owed in respect of the Property through the Closing Date have been paid in full.
    c. Evidence that Utility Charges and Maintenance Charges with respect to the Property corresponding to the period prior to the Closing Date have been paid in full.
    d. Certificates from the Community evidencing that HOA Assessments with respect to the Property corresponding to the period prior to the Closing Date have been paid in full.
    e. Such additional documents as may be necessary to otherwise consummate the transactions contemplated hereby.

10. **Closing Deliveries of Purchaser.** At Closing, Purchaser shall tender to Seller each of the following:
    a. The Purchase Price.
    b. The Transaction Documents.
    c. Such additional documents as may be necessary to otherwise consummate the transactions contemplated hereby.

11. **Post Closing Covenant.** From time to time after Closing, Seller and Purchaser agree to execute and deliver, without further consideration, such documents as either party hereto may reasonably request, in such form as may be appropriate, if necessary or advisable in connection with the consummation of the transactions contemplated hereby or any other agreement delivered in connection herewith.

12. **Closing Costs.**
    a. Except as otherwise expressly provided herein, each party shall bear its own costs and expenses in connection with the transaction contemplated in this Agreement, including, without limitation, attorneys' fees, appraisal fees, inspection costs and expenses, title studies and title insurance premiums.
    b. The Deed of Purchase and Sale shall be executed before a Notary Public selected by Purchaser. The notarial tariff corresponding to the original of the Deed of Purchase and Sale and the cost of the internal revenue, legal aid and notarial assistance stamps required to be cancelled on the original of the Deed of Purchase and Sale shall be paid by Seller. The cost of the internal revenue, legal aid and notarial assistance stamps required to be cancelled on the first certified copy of the Deed of Purchase and Sale and the recordation costs of the Deed of Purchase and Sale in the Registry of Property of Puerto Rico shall be paid by Purchaser.
    c. All costs, notarial fees and expenses related to the cancellation and/or release of record of the liens, encumbrances and mortgages on the Property, other than the Permitted Encumbrances, shall be paid by Seller.

13. **Default; Termination.**
    a. **Seller Default.** If Closing shall not occur due to any causes attributable to Seller or Seller willfully defaults on any of its obligations under this Agreement (any one of such events, a "Seller Event of Default"), Purchaser may declare Seller to be in default under the terms of this Agreement and may elect to:
        i. Initiate breach of contract proceedings to declare Seller in default under this Agreement and/or to seek specific performance; or
        ii. Give written notice to Seller (the "Seller Default Notice"), with a copy to Karla Barrera-Morstad specifying the Seller's default or defaults and stating that this Agreement shall expire and terminate on the date specified in the Seller Default Notice, if the default(s) are not cured within at least ten (10) days after the giving of the Seller Default Notice. If the default(s) are

[ ][ ] Seller's Initials          [ ][ ] Purchaser's Initials                                          5



 not cured on the date specified in the Seller Default Notice, this Agreement shall expire and terminate and thereafter Purchaser and Seller shall have no further rights and obligations under this Agreement.

  iii. Upon any termination of this Agreement due to a Seller Event of Default, the Earnest Money Deposit shall be returned to Purchaser.

 b. **Purchaser Default.** If Closing shall not occur due to any causes attributable to Purchaser, with the exception of the cause specified in Section 13(c)(i) hereof), or Purchaser defaults on any of its obligations under this Agreement (any one of such events, a "**Purchaser Event of Default**"), Seller may declare Purchaser to be in default under the terms of this Agreement and give written notice to Purchaser (the "**Purchaser Default Notice**"), with a copy to Karla Barrera-Morstad, specifying the Purchaser's default or defaults and stating that this Agreement shall expire and terminate on the date specified in the Purchaser Default Notice, if the default(s) are not cured within at least ten (10) days after the giving of the Purchaser Default Notice. If the default(s) are not cured on the date specified in the Purchaser Default Notice, this Agreement shall expire and terminate and thereafter Purchaser and Seller shall have no further rights and obligations under this Agreement. Upon any termination of this Agreement due to a Purchaser Event of Default, Seller shall be entitled to retain the Earnest Money Deposit.

 c. **Purchaser Termination.** If Purchaser is unable to complete the Closing due to: (i) any causes attributable to Seller, including Seller's inability to transfer fee simple, marketable and insurable title of the Property, free and clear of all liens and encumbrances (including, but not limited to, that the title report commissioned evidences that Seller is not owner in fee simple title); or (ii) if Purchaser decides to terminate this Agreement within the Inspection Period to the extent the inspection reveals any major problems that rendered the Property unfit for its intended use by Purchaser (residential purposes); or (iii) if Purchaser decides to terminate this Agreement within the Inspection Period to the extent the survey reveals any type of encroachment (transgression of property limit) by any adjoining lot owner or governmental agency, the Purchaser shall have the right to terminate this Agreement by written notice to Seller (the "**Purchaser Termination Notice**"), or (iv) if Purchaser decides to terminate this Agreement within the Inspection Period to the extent the environmental assessments (including lead and asbestos studies) reveal any type of issue that would render the Property unfit for its intended use by Purchaser, the Purchaser shall have the right to terminate this Agreement by sending a Purchase Termination Notice with a copy to Broker, specifying the reasons for such termination and stating that this Agreement shall expire and terminate on the date specified in the Purchaser Termination Notice, which shall be at least five (5) days after the delivery of the Purchaser Termination Notice. On the date specified in the Purchaser Termination Notice, this Agreement shall expire and terminate and thereafter Purchaser and Seller shall have no further rights and obligations under this Agreement. Upon any termination of this Agreement pursuant to the provisions of this Section 13(c), the Earnest Money Deposit shall be returned to Purchaser.

14. **Commission.** The Seller and the Purchaser each acknowledge that no real estate agents or real estate brokers have been engaged in connection with the transactions contemplated by this Agreement, except Karla Barrera ("**Broker**"). The commission payable to Karla Barrera with license number #18174 (the "**Purchaser's Broker**") in connection with the purchase and sale transaction contemplated herein shall be equivalent to 1.5% percent of the Purchase Price (the "**Commission**"). The commission shall be payable by the Purchaser at Closing. Each Party shall indemnify, defend and hold harmless the other party in the event that any real estate agent or real estate brokers institutes any claim demanding the payment of a commission pertaining to the sale of the Property by the Seller to the Purchaser.

15. **Exclusivity.** The Seller agrees that for the period commencing on the date on which the Seller executes this Agreement through the lapse of the Inspection Period, or the execution and delivery of the Deed of Purchase and Sale ("Exclusivity Period"), whichever is earlier, the Seller shall not enter into any negotiations with, or entertain any offers from, any third parties with respect to the sale of any part of the Property. To the extent the Seller has previously entered into negotiations or engaged a broker for the sale of the Property, the Seller shall immediately terminate such negotiations. This provision is binding on the Seller and shall inure to the benefit of the Purchaser for the entire Exclusivity Period.

16. **Assignment.** This Agreement may be assigned by Purchaser to any existing (or future) company or legal entity owned (or to be owned) by Purchaser.

17. **Notices.** All notices, requests, consents and other communications required or permitted under this Agreement shall be in writing and shall be, as elected by the person giving notice, and delivered by messenger or courier

56

service (including overnight delivery) or mailed by registered or certified mail (postage prepaid), return receipt requested, addressed to:
  a. If to Seller at:
  b. If to Purchaser at:
     200 Dorado Beach Drive PH 3442
     Dorado, PR 00646

     With a copy to:

     María del Rosario Fernández Ginorio, Esq.
     Ferraiuoli LLC
     221 Ponce de León Ave. Suite 500
     San Juan, Puerto Rico 00917
     mfernandez@ferraiuoli.com

  c. If to Broker at:
     i. Attention: Karla Barrera-Morstad
     ii. Email: smkarla1@gmail.com
     iii. Phone: 7876055235
     iv. Address: 2233 Villa Dorado Dorado PR 00646

18. **Governing Law.** This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the Commonwealth of Puerto Rico.

19. **Pronouns.** Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns authorized in either the masculine, the feminine or the neuter gender shall include the masculine, feminine and neuter.

20. **Severability.** If any provision of this Agreement, or the application of such provision to any person or circumstances, shall to any extent be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

21. **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

22. **Entire Agreement and Amendments.** This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof and may not be amended except by an instrument in writing signed by the parties.

23. **Waiver.** Failure of a party hereto to complain of any act, omission, course of action or continued acts or omissions, no matter how long such may continue, shall not be deemed a waiver by such party of its rights hereunder, and all waivers of the provisions hereof shall be effective only if in writing, signed by the party so waiving. No waiver of any breach of this Agreement shall be deemed a waiver of any other breach of this Agreement or consent to any subsequent breach of this Agreement.

24. **Further Assurances.** The parties agree to execute and deliver any and all other instruments and documents and do any and all other acts and things as may be necessary or expedient to more fully effectuate this Agreement and consummate the transactions contemplated hereunder.

25. **Construction.** The parties expressly acknowledge that the terms and conditions of this Agreement have been the subject of review, discussion and negotiation by the parties, and consequently, in the event of any conflict or inconsistency in the provisions of this Agreement, those conflicts or inconsistencies shall not be construed against the party that caused this Agreement to be drafted.

26. **Headings.** The headings of the Sections are for convenience and are not to be deemed controlling over the text of any Section of this Agreement.

27. **Effect of Other Agreements.** This Agreement supersedes all prior conversations, understandings, agreements and negotiations between the parties with respect to the matters contemplated herein.

[SIGNATURES ON NEXT PAGE]

[ ][ ] Seller's Initials       [ ][ ] Purchaser's Initials                                                7

57

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the day and year first written above.

| **SELLER** | **PURCHASER** |
|---|---|
| By:_____ | By:_____ |
| Name: | Name: |
| Driver's License Number: | Driver's License Number: |
| | |
| By:_____ | By:_____ |
| Name: | Name: |
| Driver's License Number: | Driver's License Number: |

58

## EXHIBIT A

### DESCRIPTION OF REAL PROPERTY

Single family home located at Lot #13 Dorado Beach Estates at Dorado Beach, Dorado P.R., with a lot size of [_____] square meters.
Catastral number (real property tax ID #): 019-000-006-03

[PLEASE INSERT LEGAL DESCRIPTION]

[ ][ ] Seller's Initials          [ ][ ] Purchaser's Initials                    9

54

## EXHIBIT B

### PERMITTED ENCUMBRANCES

Easements and restrictive covenants (if any) as further described in the title search report

[ ][ ] Seller's Initials        [ ][ ] Purchaser's Initials                                    10

60

# EXHIBIT C

## PERSONAL PROPERTY

[  ][  ] Seller's Initials          [  ][  ] Purchaser's Initials                                              11

61

# EXHIBIT D

## LEAD-BASED PAINT DISCLOSURE
[If Applicable]

[  ][  ] Seller's Initials        [  ][  ] Purchaser's Initials                                    12