UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| TEAL PEAK CAPITAL, LLC;<br><br>Plaintiff,<br><br>v.<br><br>ALAN BRAM GOLDMAN;<br><br>Defendant. | Civil No. 3:20-cv-1747<br><br>Breach Of Contract; Specific Performance Of Contract; Reimbursement Of Funds, Costs And Expenses |

# Amended Complaint

**To the Honorable District Court:**

**Comes Now**, Teal Peak Capital, LLC ("TPC"), and through the undersigned attorney, respectfully states, alleges and prays:

### I. Nature of Action

1. This action arises out of Defendant's blatant breach of his contractual obligations towards Plaintiff, by negligently, willfully and in bad-faith refusing to transfer title of his property despite Plaintiff having exercised its option to purchase the property in compliance with the terms established in a validly executed *Option to Purchase Agreement*. In this action, the Plaintiff seeks specific performance, consisting in an Order directing a third party to sign the Deed of Sale at Defendant's expense. Further, Plaintiff seeks loss of rental income due to Defendant's failure to transfer the property by the predetermined date. Last, and in the alternative, Plaintiff demands restitution of the damages suffered because of Defendant's breach of contract.

## II. The Parties

2. TPC is a limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico. TPC's registered office and mailing address is: 412 Dorado Beach East, Dorado, Puerto Rico 00646.

3. The defendant, Alan Bram Goldman ("Mr. Goldman" and/or "Defendant") is of legal age, single, and resident of the State of Vermont, U.S.A. Upon information and belief, Goldman's mailing address is: 1014 Terrace St., Montpelier, VT 05602.

4. Upon information and belief, Mr. Goldman is or was a successful real estate developer and/or builder with vast experience in matters of real estate.

## III. Jurisdiction and Venue

5. This Honorable Court enjoys jurisdiction to entertain and adjudicate TPC's claim by virtue of 28 U.S.C. §1332, because there is complete diversity of citizenship between the Plaintiff (a Puerto Rico limited liability company) and Defendant, a citizen of the State of Vermont, U.S.A. Furthermore, the amount in controversy, exclusive of interests and costs, exceeds $75,000.00.

6. Venue is proper pursuant to 28 U.S.C. §1391, in as much as the real property object of this Complaint is in the Commonwealth of Puerto Rico.

## IV. Facts

7. During the latter weeks of September or first week of October 2020, John-Michael Grzan ("Mr. Grzan") was approached by his friend and neighbor Adan Long ("Mr. Long") about a property that was for sale at Dorado Beach Estates.

8. The property belonged to the Defendant Mr. Goldman and the address was: The Estates #13, Dorado, Puerto Rico ("Property").

9. The registry description of the Property is as follows:

RUSTIC: Lot located in the North Side Development, Phase One of Dorado Beach Estates, Inc. Ward Higuillar of the Municipality of Dorado, Puerto Rico, which is described in the inscription plan of said North Side Development, Phase One with number, area and boundaries that are hereinafter related: Lot number Thirteen (13) with an area of Five Thousand Three Hundred Ninety Nine square meters and Four Thousand Seven Hundred Thirty One Ten-Thousands of a Square Meter (5,399.4731); bounding on the South, with an interior Street of the North Side of the Development, Phase One Dorado Beach Estates, Inc. on the North, with lots number Seventeen (17) and Eighteen (18) of the said North Side Development, Phase One, on the East, with Lot number Twelve (12) of the said North Side Development, Phase One; and on the West, with lot number Fourteen (14) of the said North Side Development, Phase One.

10. The Property is recorded in the Registry at page 123 of volume 46 of Dorado, property number 1,746.

11. Prior to making any decision, Mr. Grzan visited the property and was given access by Mr. Goldman's then real estate broker, Gerald Kleis Pasarell ("Mr. Kleis").

12. After examining the Property and discussing the possible purchase with his wife, Namrata Khimani ("Dr. Khimani") (together with Mr. Grzan, "Grzan-Khimani"), Mr. Grzan expressed interest to Mr. Long; and Mr. Long, as a favor and on behalf of Mr. Grzan and his wife, negotiated with Mr. Goldman the purchase of the Property.

13. After a few conversations and email exchanges, Mr. Goldman agreed to sell the Property for $3,250,000.

14. Having agreed upon a price, on October 14, Mr. Grzan sent to Mr. Goldman –through Mr. Long—a signed copy of an Option to Purchase Agreement.

15. Mr. Long forwarded the signed document to Mr. Goldman by email the same day and took the opportunity to copy Mr. Grzan and introduce him to Mr. Goldman.

16. Mr. Goldman did not sign the document, however, and when pressed by Mr. Long, expressed having difficulty with letting go of some of the personal items in the Property and the logistics of moving others out. Nevertheless, he sent to Mr. Grzan a modified draft of the Option to Purchase Agreement while assuring him that despite receiving other offers "my home is under contract to a nice family! I keep my word."

17. Surprisingly, on October 20, 2020, Mr. Goldman wrote to Mr. Grzan and, despite having said his "home was under contract", told him he had received another offer for $3,750,000 he could not refuse, and asked Grzan-Khimani if they wanted to match it.

18. Mr. Grzan was very disappointed because they already had an agreement. But after discussing the options with his wife and before making any decision, they asked Mr. Goldman to send first a signed copy of the Option to Purchase Agreement with the new price –to make sure Mr. Goldman would not go back on his word again.

19. Mr. Goldman proceeded to send a signed copy of the modified Option to Purchase Agreement. The draft, however, had errors, and by the time they were corrected and the parties ironed out several details, the Agreement expired.

20. Mr. Goldman recognized the Agreement had expired, so he modified the draft by extending the deadline to 11:59 pm of October 22, 2020 and sent it to Mr. Grzan.

21. Grzan-Khimani did not accept the new terms, and on email sent early on October 22, told Mr. Goldman they would not buy the Property and that he was free to accept the offer made by the other prospective buyer.

22. To make sure Mr. Goldman understood he was free to sell the property to someone else, Mr. Grzan sent a second email telling him they would "not take the offer", and to "feel free to deal with others as you wish."

23. For Grzan-Khimani that was the end of their bid to buy Mr. Goldman's Property.

24. Then, on October 23, without any requests from Mr. Grzan, Mr. Goldman sent him an email expressing the following:

> Trying to make his happen. I was greedy and should have been more appreciative. To pay for my foolishness, I will sell my home for $50,000 less. 3.2, that is a sweet heart deal! let's put this back on track and use Adam,s attorney/team to make this happen! Thank you Adam for putting up with my greedy behavior. But it was hard to say no an offer came in all cash for 3.75.
>
> This is meant to be your home JM and now your better half will have $50,000 more to improve your home. Please let me know what you all are thinking. You can make more money, not more time! Building in PR is not easy.

25. Grzan-Khimani were unsure whether to engage with Mr. Goldman once more, so, to convince them, Mr. Goldman lowered the price a bit more and offered to sell the Property for $3,150,000.

26. Grzan-Khimani accepted the new offer and on October 23, 2020 the parties executed an *Option to Purchase Agreement* (the "Agreement"), whereby Mr. Goldman granted to Grzan-Khimani an exclusive option to purchase the Property. (Exhibit 1)

27. According to the agreed upon terms, the purchase price of the Property was $3,150,000.00, payable as follows: (i) initial deposit of $200,000.00 (the "Deposit"), payable by check, money order or wire transfer, deposited in an escrow account held by

The Title Security Group, LLC (the "Escrow Agent"), and (ii) the remaining balance of $2,950,00.00 payable to Mr. Goldman on the closing date (the "Purchase Price"). *See*, Exhibit 1, Option Agreement, ¶¶3, 5.

28. Additionally, the parties agreed that Grzan-Khimani had 30 calendar days from the date of signing the *Option Agreement* –until November 23, 2020– to exercise the option (the "Exercise Period"). *See,* Exhibit 1**,** Option Agreement, ¶5. However, if closing was not possible within the Exercise Period due to unexpected delays, Grzan-Khimani could extend the *Exercise Period* for an additional 30 days (the "Extension Period") by paying directly to Mr. Goldman, before the expiration of the *Exercise Period*, another $600,000.00, for an aggregate amount of $800,000.00 (the "Extension Payment"). The remaining balance $2,350,000.00 would be paid at closing. *See, id.* The *Extension Payment* would be applied to the *Purchase Price* and would be used by Defendant to purchase a land located in Vermont, U.S.A. *See, id.*

29. Further, pursuant to Clause 5 of the *Option Agreement*, and because the *Purchase Price* was to be used by Defendant for funding a time-sensitive project, the parties agreed that the *Option Agreement* was "subject to the good faith belief of the title company and attorney that closing within the given time frame is reasonable[,]" and therefore both Grzan-Khimani and Mr. Goldman agreed to **"**make best and reasonable efforts to provide needed material and take reasonable action necessary to close in a timely manner." *See,* Exhibit 1, *Option Agreement*, ¶5.

30. At no time prior to the signing of the *Option to Purchase Agreement* on October 23, 2020 was Mr. Goldman ever contacted or received any communication of

any kind from anyone at Ferraiuoli, LLC purporting to represent Mr. Grzan and/or his wife Mrs. Khimani, in the process of negotiating the *Option to Purchase Agreement*.

31. Mr. Goldman does not possess any document, email, letter, communication, or material evidence of any kind showing that prior to the signing of the *Option to Purchase Agreement* on October 23rd, 2020, Mr. Grzan and/or his wife Mrs. Khimani were represented by anyone at Ferraiuoli, LLC in the process of negotiating the *Option to Purchase Agreement*.

32. Grzan-Khimani was never advised, counseled and/or assisted by anyone at Ferraiuoli, LLC in the process of negotiating with Mr. Goldman the *Option to Purchase Agreement* signed on October 23, 2020.

33. Immediately after the Agreement was signed, Mr. Grzan deposited the initial $200,000 to the escrow account chosen by the parties. Then, he hired the services of notary Mr. Miguel Carbonell-Astor from the Firm Adzuar Muñiz Goyco Seda & Pérez-Ochoa, CSP, to begin the process of securing all the documents and information necessary to complete the transaction and close on or before the agreed upon date.

34. On October 27, the notary sent the parties a checklist of the items needed to successfully complete the transaction, with indication of the responsible party for producing the information.

35. During the following days, Grzan-Khimani assigned the *Option to Purchase Agreement* to TPC and informed the notary that TPC would be purchasing the Property. He also sent the notary all the documents pertaining to the entity so the Deed of Sale and other documents could be prepared with TPC as the buyer.

36. On November 5, 2020, Mr. Grzan was notified of a lawsuit filed by Mr. Kleis, Mr. Goldman's real estate broker, in which the former alleged that Mr. Goldman had refused to honor their agreement and pay the brokerage fee applicable to the sale of the Property. The Complaint was captioned: *Gerald Kleis Pasarell, v. Alan Bram Goldman*; Civil Case Number BY2020CV03482.

37. Then, on November 12, 2020, Mr. Grzan learned that Mr. Kleis had also filed a Notice of Lis Pendens in the Registry of Property for monies owed in the amount of $31,500.00, plus interest and other amounts.

38. Despite the above, Mr. Grzan –on behalf of TPC-- continued to do all that was necessary to close the transaction in time. He made multiple accommodations to Mr. Goldman's demands and sometimes unreasonable requests, including providing a relocation agent to help him move his personal belongings and extending to 60 days after closing the deadline for Mr. Goldman to conclude with the process. Mr. Grzan also followed up regularly with Mr. Goldman through emails and phone calls to make sure he had everything he needed to close on or before November 23rd.

39. In the end, TPC complied with all the terms of the *Option to Purchase Agreement* and exercised the option on time.

40. Mr. Goldman, on the other hand, did not provide by November 23, 2020 "fee simple, recordable, marketable and insurable title of the Property free and clear of all liens, encumbrances and defects," as stipulated in the Agreement. He also failed to execute a Power of Attorney on time to authorize his representative to sign the Deed of Sale; and resolve the lawsuit filed by his broker, Mr. Kleis, so the Notice of Lis Pendens

could be removed from the Registry and the title insurance company issue a policy. In conclusion, Mr. Goldman defaulted on the *Option to Purchase Agreement*.

41. Notwithstanding the above, TPC agreed to extend the closing date.

42. To consummate the extension, Mr. Grzan asked Mr. Goldman to provide his bank information so TPC could pay the additional $600,000 by wire transfer before the November 23rd, 2020 deadline.

43. Mr. Goldman provided the information by email on Friday, November 20, 2020.

44. Using the information received, Mr. Grzan –on behalf of TPC— proceeded without delay to wire the $600,000, but the transaction did not go through because the bank information provided by Mr. Goldman was incorrect.

45. Mr. Grzan informed of this to Mr. Goldman, who recognized having sent incorrect information.

46. TPC, however, did not sit idle by waiting for Mr. Goldman to send the correct bank information. To make sure the money was transferred on time, TPC deposited on November 23rd, 2020 the additional $600,000 in the escrow account where the first $200,000 were deposited. Then, once the correct bank information from Mr. Goldman was received through email of November 23rd, the entire $800,000 deposited were wired to him on the following day, November 24, 2020.

47. All of this was done with Mr. Goldman's knowledge and acquiescence, which is confirmed by several emails. Indeed, he signed the escrow release documents on November 23rd after being informed twice –once by the escrow agent and once by the notary— that the money would be transferred on November 24th.

48. At no time did Mr. Goldman expressed payment was untimely nor that the Agreement was no longer binding. He received the funds without any objection.

49. In addition to agreeing to extend the closing date and paying the $800,000 directly to Mr. Goldman, TPC, through Mr. Grzan, agreed on the side to settle with Mr. Kleis the lawsuit he had filed for collection of money to clean the title of the Property. However, in email sent to Mr. Goldman on November 23, 2020, Mr. Grzan made the following clear: "Please also note that this settlement is contingent on us actually closing, which I expect we will be able to do."

50. Being clear that settlement with Mr. Kleis was contingent upon closing on the Property, Mr. Kleis attorney prepared a draft of a Voluntary Dismissal but refrained from filing it until closing took place. An escrow agreement was also drafted and approved by all parties to guide the disbursement of settlement funds. Finally, Mr. Kleis agreed in writing to remove the Notice of Lis Pendens once closing took place and settlement was honored.

51. On December 1, 2020, Mr. Grzan sent to the notary and closing agent proof of TPC's funds availability to complete the transaction.

52. Then, suddenly, Mr. Goldman ceased to respond to emails.

53. Mr. Grzan wrote numerous emails between November 30 and December 18 and Mr. Goldman responded to none.

54. The notary, Mr. Carbonell, also wrote to Mr. Goldman on multiple occasions, even pleaded with him to respond and review the closing documents so the transaction could take place, but Mr. Goldman refused to do so.

55. In these communications, for example, Mr. Goldman was notified that TPC would be the purchaser of the Property. In fact, Mr. Goldman received many emails and documents weeks prior to the closing date showing that TPC would purchase the Property. The Deed of Sale sent to him weeks prior to the closing showed TPC as the buyer.

56. During this period, Mr. Goldman did however respond to a few phone calls. Unfortunately, when Mr. Grzan demanded during the calls that Mr. Goldman comply with the *Option Agreement*, he would respond by saying things like "no one tells me what to do;" "I do what I want;" "we'll see about the 800k. Maybe I'll give it back, maybe I won't. Depends how I feel;" "if you do anything, I will go after you;" "I am a very powerful person;" "I have many connections;" "I will make your lives miserable;" "I will go after your business;" and "I will ruin you and your wife on the internet."

57. Given the stand still, Mr. Long called Mr. Goldman and tried to mediate the matter, but he responded with similar threats.

58. The closing was set for Tuesday, December 15, 2020, however, because Mr. Goldman refused to respond, review the documents and provide the information that for more than three weeks had been requested of him, the closing did not take place.

59. So, by December 15, 2020, TPC had already exercised its option to purchase the Property and the closing did not take place because Mr. Goldman defaulted on his obligation.

60. Out of options, TPC asked Ferraiuoli, LLC to formally intervene, firm that early in 2020 had provided Mr. Grzan and his wife Dr. Khimani services in the areas of estate planning, living will, and tax advisement.

61. On December 16, 2020, Mr. Jean Vidal, of Ferraiuoli, LLC, prepared a letter in representation of TPC to inform Mr. Goldman that TPC was ready to close, that all the documents were ready to be signed and the funds ready to be transferred, and that all that remained was for him to grant his representative, Mr. Rey Rios –who had been appointed through a Power of Attorney to close on his behalf— authorization to close before the new deadline of December 23, 2020. Mr. Vidal also advised that if Mr. Goldman did not proceed with closing, TPC would not be shy in exercising all legal options at its disposal.

62. The letter was sent out on December 18, 2020, after Mr. Grzan gave Mr. Goldman a heads up through email.

63. Because Mr. Goldman defaulted on its obligations despite TPC having exercised its option to purchase the Property, TPC was left with no other alternative but to file a Complaint on December 24 2020, and seek specific performance.

64. Then, on December 29, 2020, Dr. Khimani, who is a doctor, began to receive terrible online reviews from individuals who had never been her patients. In one of the reviews posted on Healthgrade on December 31, 2020, the comment read:

> horrific bedside manner. worst medical professional have ever dealt with in 63 years! Ms. Khimani was very late to appointment and would not stop complaining about her husband, so unprofessional.

Ari Flieshman – Dec 31, 2020.

65. Then, on January 3rd, 2021, both Mr. Grzan and Mr. Long began receiving "threatening text" messages and calls. Mr. Grzan's text read:

> Brotha, this isn't the same as trying to remove a spruce tree from the front yard and replace with an ornamental tree is it? There's literally like an entire city of programmers in India working now. What did you do? Who you pick a fight with bro?
>
> What did you do? There's like a whole city in India putting things online. You in a fight? Whats up with all this Namik stuff online?

66. The part about the "spruce tree" is a reference to Mr. Grzan's father who tried once to get permission to remove a spruce tree from his property. Also, Namik is the name of the company of his wife, Dr. Khimani.

67. Mr. Long's text read as follows:

> Hey bro, you in Dorado?
>
> > Who is this?
>
> Dude? It's not dorothy back home in Kansas! You in Dorado? You shooting hoops with the Basketball star? Crazy how much pressure is being put out there. You pick a fight with a billionaire or something?
>
> > Who is this?
>
> "Growing old is no more than a bad habit which a busy man has no time to form." Remember the strength is loyalty to each other. Who you going to be loyal too?

68. He also received a voice mail that said:

> Hey Adam, long time since Sky Las Vegas. Give me a holler back before this situation goes south. I can't believe the people that are flying in. Give me a holler back ASAP.

69. Mr. Long is from Kansas and Mr. Grzan played basketball in college.

70. Given the seriousness of the matter, a complaint was filed with the FBI, who we understand has begun an investigation.

13

71. To this day, Mr. Goldman continues to refuse to close on the Property and transfer title, despite TPC having exercised its option to purchase the Property in accordance with the *Option to Purchase Agreement* duly and freely executed by all the parties, as well as paid the $800,000 directly to Mr. Goldman, money he is still retaining.

**First Cause of Action**
**Breach of Contract – Specific Performance**

72. TPC incorporates by reference and alleges herein every averment set forth in the preceding paragraphs.

73. On October 23, 2020, Mr. Goldman, who upon information and belief was a real estate developer or builder, with ample knowledge of real estate matters, granted TPC an option to purchase his Property at Dorado Beach Estates through the signing of an *Option to Purchase Agreement*. (Exhibit 1)

74. Mr. Goldman's consent was freely given and informed.

75. In fact, it was Mr. Goldman who voluntarily and without any requests from Mr. Grzan and/or TPC chose to lower the purchase price after recognizing he "was greedy and should have been more appreciative."

76. Following the execution of the *Option to Purchase Agreement*, TPC complied with all its obligations and, on December 15, 2020, exercised its option to purchase the Property.

77. Mr. Goldman, however, refused to authorize his representative to sign the Deed of Sale, defaulting on his obligation to transfer title of the Property in accordance with the Agreement.

78. The Supreme Court of Puerto Rico has defined an Option Contract as one whereby a party, known as the optionor or promisor, grants the other, the optionee, "for

a fixed term and under certain conditions, the exclusive power of deciding whether to execute a principal contract." *Mega Media Holdings, Inc. v. Aerco Broad. Corp.*, 852 F. Supp. 2d 189, 200 (D.P.R. 2012) (emphasis added) (internal citations omitted). Hence, an option contract is of unilateral nature, "inasmuch as the optionee is under no obligation to purchase, while the prom[isor] has the obligation to sell to the optionee if the latter so decides." *S.L.G. Irizarry v. S.L.G. Garcia*, 155 D.P.R. 713, 722, 2001 WL 1555664, __ P.R. Offic. Trans. ___ (2001).

79. Because of its "unilateral nature", it is understood that once the optionee exercises its option to purchase the property, the Option Contract is extinguished and the Purchase and Sale Agreement is consummated. J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Bosch, 1982, T. II, Vol. 2, p. 60.

80. In this scenario, where the Purchase and Sale Agreement has been consummated, seller becomes obligated to transfer title of the purchaser by signing the Deed of Sale. *See*, Article 1350 of the Civil Code of Puerto Rico of 1930, 31 LPRA § 3801; and Article 1287(f) of Civil Code of Puerto Rico; Act 55 of June 1, 2020.

81. In the event the seller refuses to comply with its obligation and transfer title by signing the Deed of Sale, the Court can appoint a third party, like a Marshall, to do so at the expense of the party that refuses to comply with its obligation. *See*, Article 1051 of the Civil Code of Puerto Rico of 1930; 31 LPRA § 3015; and Article 1080 of the Civil Code of Puerto Rico of 2020; Act 55 of June 1, 2020.

82. In this case, TPC exercised its Option to purchase Mr. Goldman's Property on December 15, 2020.

83. From that moment on, the Purchase and Sale agreement was consummated, and Mr. Goldman was obligated to transfer title of the Property by signing the Deed of Sale.

84. Mr. Goldman refused and continues to refuse to do so.

85. Wherefore, TPC asks this Honorable Court to order a third party to sign the Deed of Sale in Mr. Goldman's place and at his expense, so title of the Property may be transferred to TPC.

## Second Cause of Action
## Damages – Lost Rent

86. TPC incorporates by reference and alleges herein every averment set forth in the preceding paragraphs.

87. Once in possession of the Property, TPC intended to do some basic remodeling to then rent it to take advantage of the booming Dorado Beach real estate market.

88. TPC estimated that the basic remodeling would take somewhere between one to two months, and because the real estate market in Dorado Beach is extremely active, had no doubts it could have the house leased by no later than April, 2021.

89. Other properties in the area –of smaller size-- are renting between $30,000 to $40,000 a month.

90. TPC estimated it would easily rent the Property for $35,000 a month.

91. Because Mr. Goldman defaulted on his obligation and prevented TPC from taking possession of the property, TPC has been unable to receive the rental income it would have begun to receive had Mr. Goldman complied with his obligations.

92. If Mr. Goldman would have transferred title on December 15, 2020, as originally scheduled, TPC would have begun to receive $35,000 beginning in April of this year.

93. Wherefore, in addition to specific performance, TPC requests from this Honorable Court to order Mr. Goldman pay damages to TPC consisting of the rental income it has lost due to Mr. Goldman's refusal to transfer title of the Property in accordance with the *Option to Purchase Agreement*, amount that is estimated at $35,000 a month from April of this year. TPC also asks that the Court order payment of three additional months in prospective rent for the time it will take TPC to rent the property once judgment is entered.

### Third Cause of Action in the Alternative
### Damages

94. TPC incorporates by reference and alleges herein every averment set forth in the preceding paragraphs.

95. Only if this Honorable Court is unable to order the transfer of title of the Property to TPC, Mr. Goldman is liable to TPC for all the damages he has caused as a result of his bad faith and willful refusal to comply with his obligations.

96. Such damages include all the costs TPC incurred in the hiring of a notary, closing agent, preparation of all closing documents and time consumed to bring the transaction to a fruitful conclusion. These costs are estimated at $200,0000.

97. They also include the $800,000 good faith deposits that to this day Mr. Goldman retains, and the loss of use of that $800,000, from the date they were deposited in the escrow account and paid to Mr. Goldman, value that is estimated at $100,000.

98. Finally, the money TPC would have earned –with the rent and/or sale— had it acquired title of the property on December 15, 2020, which is conservatively estimated at $7,060,000.

99. Wherefore, TPC asks as an alternative remedy to order Mr. Goldman pay the damages caused to TPC for breaching the *Option to Purchase Agreement* and refusing to transfer title of the Property, damages that are conservatively estimated at $8,160,000.

**Wherefore**, TPC respectfully requests from this Honorable Court to enter judgment in its favor and consequently order:

1. A third party to sign the Deed of Sale and transfer title of the Property at Mr. Goldman's expense.
2. Mr. Goldman to pay TPC all the rental income it has lost as a result of refusing to comply with his obligation to transfer title of the Property, amount that is calculated at $35,000 a month beginning on April of this year and continuing until title of the Property is transferred. TPC also asks that the Court order payment of three additional months in prospective rent for the time it will take to rent the Property once title is transferred, because of the time that has been waisted due to Mr. Goldman's willful breach of contract.
3. In the alternative, that Mr. Goldman pay TPC the damages it has suffered as a result his failure to comply with his contractual obligation to transfer title of the Property, damages that are estimated at $8,160,000.
4. Payment of costs and a reasonable amount of attorney's fees.

**Respectfully Submitted.**

In San Juan, Puerto Rico, this 28th day of May 2021.

**I hereby certify** that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system, which will send notice of its filing electronically to the attorneys of record.

**Sánchez-Betances, Sifre & Muñoz-Noya, LLC**
33 Calle Bolivia, Suite 500
San Juan, PR 00917
t. 787-756-7880
f. 787-753-6580

s/*Adrián Sánchez-Pagán*
**Adrián Sánchez-Pagán**
USDPR NO. 223311
asanchez@sbsmnlaw.com