| | |
|---|---|
| Teal Peak Capital, LLC; | Civil No. 3:20-cv-1747 |
| *Plaintiff and Counter Defendant*, | |
| And | |
| John Michael Grzan And Namrata Khimani | Breach of Contract; Specific Performance of Contract; Reimbursement of Funds, Costs And Expenses |
| *Counter Defendant*, | |
| v. | |
| Alan Bram Goldman; | |
| *Defendant*. | |

**Joint Proposed Pretrial Order**

**To The Honorable Court:**

**Come Now** plaintiff counter defendant, Teal Peak Capital, LLC (TPC); joint counter defendants John Michael Grzan and his wife, Namrata Khimani (Mr. Grzan and Dr. Khimani); and defendant Alan Bram Goldman (Mr. Goldman), and through their respective legal representations, respectfully submit this Joint Proposed Pretrial Order for this Honorable Court's consideration:

**I.     Attorneys For the Parties**

**A.  TPC:**

Adrián Sánchez-Pagán
USDPR NO. 223311
**Sánchez-Betances, Sifre &**
**Muñoz-Noya**
PO Box 364428

San Juan, PR
t. 787-756-7880
f. 787-753-6580
asanchez@sbsmnlaw.com

**B.  Mr. Grzan and Dr. Khimani:**

Héctor Eduardo Pedrosa Luna
USDPR NO. 223202
**The Law Offices of Héctor E. Pedrosa Luna**
PO Box 9023963
San Juan, PR 00902-3963
t. 787-920-7983
f. 787-754-1109
hectorpedrosa@gmail.com

**C.  Mr. Goldman:**

**McConnell Valdés LLC**
PO Box 364225
San Juan, Puerto Rico 00936-4225
270 Ave. Muñoz Rivera
Hato Rey, PR 0918
T: 787-250-5604

Antonio A. Arias-Larcada
USDC-PR 204906
aaa@mcvpr.com

José A. Irizarry-Castro
USDC-PR 308803
jic@mcvpr.com

**II.      Theory Of the Case**

**A.  TPC:**

**Introduction**

      This is the story of an individual who violated the trust vested upon him by a family

residing in Puerto Rico, that, in good faith, negotiated and entered into an Option to

Purchase Agreement (Option) to purchase his property at #13 Dorado Beach Estates

(Property).  The trust was first violated by agreeing to sell the Property for a certain price,

then act as if an agreement had been reached, while, at the same time, continuing to negotiate with another prospective purchaser behind the family's back. Second, by once having received an offer from the prospective purchaser, use that as leverage to undue the agreement with the family, unless they agreed to pay $500,000 more than originally agreed. Third, by luring the family back to the table after they had walked away from the process and the prospective purchaser withdrawn his offer –because of Goldman's unreasonable demands, with a discounted price and promises that the Property would be theirs, when, in fact, he had no real and earnest intention of selling the Property for the discounted price. His goal was to use the property to obtain a significant amount of money –without interest, to fund a project he had in his residential State of Vermont. He did this by including terms in the Option that would require the family to pay $800,000 directly to him, if closing did not occur in a month –which he made sure would not, and the insertion of an ambiguous and confusing clause that would, according to his own interpretation, relieve him of any obligation to sell the property, by simply returning the money after being used and benefiting him. This is evident by the fact that days after receiving the cash, the individual practically disappeared and withheld his approval of the documents necessary for the transaction.

Then, after the family bent over backwards to eliminate all obstacles and the individual failed to approve the transaction and authorize his attorney in fact to sign the Deed, the family, who, by this time, had assigned the contract to an entity, had no alternative but to seek legal representation. When the individual found out, he concocted a baseless and completely unsubstantiated conspiracy theory –one for which he has no evidence whatsoever, to say that the Option was null because the attorneys had

conspired with the family to defraud him. The Option is valid. It is a contract that suffers none of the ailments recognized in our legal system to render it null. The Option is thus enforceable and should be enforced in this Court. Additionally, this individual should not receive the benediction of this Court by letting him walk away with simply returning the $800,000 he received, kept for over a year and served him to make money in another project. Neither after repeatedly abusing the trust that in good faith was vested upon him by the family who honestly wanted to purchase his Property. And, lastly, not after going as far as intimidating the family with threats and attempting to harm their reputation by posting negative reviews online. Wherefore, defendant Alan Bram Goldman (Mr. Goldman) must be compelled to comply with his obligation to sell his property at #13 Dorado Beach Estates, or the Court designate a third party to do so on his behalf, at his expense. Moreover, Mr. Goldman should be found liable for damages and ordered to pay plaintiff Teal Peak Capital, LLC (TPC) all the rental income it lost because Mr. Goldman refused to comply with his obligation to transfer title of the Property, amount that is calculated at $35,000 a month beginning in April of 2021 and continuing until title of the Property is transferred. TPC also asks that the Court order payment of three additional months in prospective rent for the time it will take to rent the Property once title is transferred, because of the time that has been waisted due to Mr. Goldman's willful breach of contract. In the alternative, TPC asks that Mr. Goldman pay for the damages TPC suffered as a result of his failure to comply with his contractual obligation to transfer title of the Property, damages that are estimated at $8,160,000. Last but not least, TPC requests payment of costs and a reasonable amount of attorney's fees.

## 1. The Plaintiffs

TPC is a Limited Liability Company that was created on October 13, 2020, for the purpose of owning and investing in real estate. Its president is John Michael Grzan (Mr. Grzan) and vice president, his wife, Namrata Khimani (Dr. Khimani). The company is fully owned by Kayana Trust, which was formed on July 24, 2020, by Mr. Grzan and Dr. Khimani. Both are the grantors and beneficiaries of the trust. The Trustee is Dr. Khimani's brother, Aaditya Khimani. The idea behind the trust was to manage their state and ensure the inheritance of their family, especially their two girls.

Mr. Grzan, on the other hand, works in finance, specifically, in portfolio management, while his wife is a medical doctor with subspecialty in pain management and venous medicine. They move to Puerto Rico from New York three years ago, with the intention of making Puerto Rico their permanent home to raise their two girls. To that end, they initially settled in a house in Dorado Beach East, but after a while, began to explore the possibility of buying a larger home with more space for the family.

## 2. The Facts

### i. The Negotiation of the Option

Early in October 2020, a friend of Mr. Grzan, Adam Long (Mr. Long), told Mr. Grzan about a house for sale in Dorado Beach Estates. It was lot #13. Mr. Long had tried to purchase the property a year earlier, but the owner, Mr. Goldman, never responded to his offer of $2,500,000, give or take. When Mr. Grzan confirmed that he was interested in the property, Mr. Long contacted Mr. Goldman and told him about Mr. Grzan. Once the parties agreed to move forward, Mr. Long then began to negotiate with Mr. Goldman the price of the property, on behalf of Mr. Grzan. Also, to further assist Mr. Grzan, Mr. Long

put him in contact with his real estate attorney, Mr. Miguel Carbonell-Astor (Mr. Carbonell), from the firm Adsuar Muñiz Goyco Seda & Pérez Ochoa, PSC, and also provided him with a draft of the Option to Purchase Agreement Mr. Long used to purchase his house in Dorado Beach East, so that Mr. Grzan could use it with Mr. Goldman. Of note, the draft Mr. Long sent to Mr. Grzan did not contain a clause dealing with "sellers' default".

Prior to seeking Mr. Goldman's property, Mr. Grzan had very little experience in real estate. The only real estate transactions he had been a part of were the purchase of his home in New York and the property at Dorado Beach East, in Puerto Rico. Mr. Goldman, on the other hand, had plenty of experience in real estate. Mr. Goldman has been a real estate developer for a significant portion of his life. He began by buying real estate assets, fixing, and reselling them for a profit. Then, by buying those same assets, fixing them up and keeping them as rentals. He currently owns a commercial building, an apartment building, several rental properties, land, lake house, and, until recently, a motel. Currently, he is leading a major development project in Vermont.

After hearing about Mr. Grzan's interest, Mr. Goldman appeared anxious to close a deal, for he wrote many emails to Mr. Long asking whether Mr. Grzan was interested in the property. Mr. Long responded in the affirmatively. Several conversations later, Mr. Long was able to have Mr. Goldman and Mr. Grzan agree on a purchase price of $3,250,000. With the price set, Mr. Grzan proceeded on October 14, 2020, to sign the Option to Purchase Agreement draft he received from Mr. Long, with minor changes, and send it to Mr. Long, who immediately forwarded it to Mr. Goldman for his signature, and

with an introduction to Mr. Grzan. The Option to Purchase Agreement (Option) that Mr. Grzan signed and sent to Mr. Long did not contain a clause dealing with "sellers' default".

Three days passed without any response from Mr. Goldman, which was unusual given his initial insistence on receiving an offer. So, on Saturday, October 17, Mr. Long followed up with him. Mr. Goldman finally responded on October 18, at 1:29 a.m., offering as reason for not responding sooner that he had fallen asleep on the couch. With the email, Mr. Goldman sent a revised draft of the Option. It was in that draft, for the first time, that the clause dealing with "sellers' default" was included. In that regard, the clause stated:

> In the event Seller, after exercise of the Option granted herein, fails to proceed with the closing of the sale of the Property pursuant to the terms and provisions contained herein, Purchase shall be entitled to receive back the Option Fee and pursue any equitable remedies under law.

Thus, it was Mr. Goldman who drafted and included the "sellers' default" clause. Of importance as well, is that Mr. Goldman mentioned in the email that three others had reached out to look at the property, that he had allowed them to look, but with the caveat that his "home is under contract to a nice family! I keep my word." These words were written in bold typeface. Fact is, however, that Mr. Goldman was not keeping his word, neither negotiating in good faith.

During the morning hours of Sunday, October 18 (8:00 am), Mr. Goldman wrote several emails to Mr. Long and asked whether they still had a deal. Mr. Long was a bit irritated by the insistence and the fact that it was Sunday. Nevertheless, he responded by clarifying that he knew of no issues. Then, during the afternoon, Mr. Goldman and Mr. Long spoke to fine tune certain aspects of the Option, including the inclusion of the $200,000 good faith deposit and a $600,000 direct payment to extend the Option. At

night, Mr. Goldman informed Mr. Long that he had sent the draft to his attorney and that he would circle back after receiving his attorney's approval. In his final remark, Mr. Goldman said: "Let's make this happen!" Finally, around 9:00 pm, Mr. Goldman and Grzan spoke for the first time, and, in addition to exchanging pleasantries, discussed more details of the transaction. At no point during all of those exchanges did Mr. Goldman informed that he was actively engaging with other prospective buyers to sell his property, when in fact, he was. Since the day before Sunday, October 18, Mr. Goldman had been providing information about his property in Dorado to a real estate agent named Karla Barrera (Mrs. Barrera), who represented having a client interested in the Property. He continued to encourage Mrs. Barrera to make an offer on the following day, October 18, while telling her he had two other "serious buyer." At 2:35 pm, Mr. Goldman received the offer he was hoping for. The offer came from an individual called Hyung Lee (Mr. Lee), and it was for $3,750,000. Never did Mr. Goldman mention any of this to Mr. Long nor Mr. Grzan, who he spoke to about the sale of his property hours later. Neither did he mention to Mrs. Barrera's that he had already agreed to sell his property to Mr. Grzan for $3,250,000. To the contrary, after receiving the $3,750,000 offer, Mr. Goldman responded to Mrs. Barrera saying "[g]ood news" and "lets work on this asap." It is important to mention that the first batch of emails form Mrs. Barrera, particularly the offer, contained no indication that Mr. Lee was being represented by the firm of Ferraiouli, LLC.

The next day, October 19, Mr. Grzan followed up with an email to let Mr. Goldman know he would contact his layers –which he never did— to keep pushing the transaction forward and that he would try to set up the escrow payment on that day because he suspected he might have to fly out of Puerto Rico the following day. Again, Mr. Goldman

did not stop Mr. Grzan from moving forward nor tell him he had another offer. He simply ignored the email and focused instead on securing a deal with Mrs. Barrera's client, Mr. Lee. Additionally, during the day, Mr. Goldman attempted to hold a conference call with Mrs. Barrera, telling her he was available to talk. Yet, Mr. Grzan tried to reach him many times and Mr. Goldman simply ignored his calls.

Later that night, at 7:39 pm, Mr. Goldman finally informed Mrs. Barrera he would agree to sell for $3,750,000, while adding: "Please respond to let me know Buyers agree so I will tell the others to stop calling me...LOL." In response, Mrs. Barrera stated: "Perfect. We have an agreement, I will send over a PSA for your review tomorrow." After reaching an agreement with Mrs. Barrera, Mr. Goldman answered Mr. Grzan's call. During the conversation, Mr. Goldman acted as if he was moving forward and gave no indication that he had agreed to sell his property to another buyer for a higher price.

On October 20, Mr. Grzan called Mr. Goldman several times, but never got a hold of him. Then, at 6:35 pm, Mr. Goldman wrote and informed Mr. Grzan of "another offer [that] had come in," and asked whether he wanted to match it. He copied the details of the offer but did not reveal the name of the offeror. Needless to say, Mr. Grzan was surprised and blindsided. As far as he was concerned, Mr. Goldman had agreed to sell his property for $3,250,000 since October 14, and now, six days later, Mr. Goldman was asking for more money because of a new offer that came in. Given the circumstances, Mr. Grzan responded by stating that he was disappointed, but that he would discuss the matter with his wife. They spoke over the phone later that evening, and Mr. Grzan told Mr. Goldman that, if he was genuine about the offer, to first send him a signed contract for consideration. Mr. Grzan did not want to relive his previous experience where Mr.

Goldman agreed to sell the Property for a set price and continue to negotiate with others to seek a better deal.

Interestingly enough, shortly after informing Mr. Grzan that a new offer had come in, and granting him the opportunity to match it, Mr. Goldman wrote to Mrs. Barrera and told her he was looking forward "to seeing if [they] could make this work." By this time, however, the negotiations between Mr. Goldman and Mrs. Barrera were confronting problems. For example, Mr. Goldman did not want to provide Mr. Lee the time he asked for to inspect the Property. Neither did he accept that keeping the good faith deposit would be sufficient compensation in the event purchaser defaulted.

Again, while in open negotiations with Mrs. Barrera, Mr. Goldman sent a revised draft of the Option to Mr. Grzan with the new price of $3,750,000. The draft contained errors. So, Mr. Grzan corrected it and sent it back for Mr. Goldman's review. Mr. Goldman received it and, after reviewing it, sent a signed copy at 5:43 pm. That signed draft had a clause stating that it needed to be signed and returned before midnight of October 21. Mr. Grzan and Dr. Khimani had not reached a definitive conclusion whether to meet the higher price. That night they had a heated and emotional debate about the situation. So, they did not sign the newer Option. The next day, October 22, Mr. Grzan woke up jammed with work. He saw Mr. Goldman's email asking if they were moving forward. Feeling pressure, Mr. Grzan and his wife just decided to give in and sign it. Not 10 minutes later, Mr. Grzan realized that the signed document was not valid because it had been sent past the deadline. So, he wrote to Mr. Goldman, informed him of the problem, and asked him to send a new one with a different deadline. Mr. Goldman sent a new one around 9:59 am. and Mr. Grzan acknowledge receipt and asked to allow him to review it.

At 11:08 of the same October 22, while Mr. Grzan attended matters at work, Mr. Goldman received an email from Mrs. Barrera, with a forward from Mr. Lee's attorney, María del Rosario Fernández-Ginoro, from the firm of Ferraiouli, LLC, stating that, "[a]fter consideration of the conditions proposed by seller Mr. Lee has decided to withdraw his offer..." Mr. Goldman responded by saying: "Odd since that firm represents me. But ok I wish you all well." It was, thus, through this email, that Mr. Goldman learned that Mr. Lee's attorneys was the firm of Ferraiouli, LLC. Interestingly, though, that Firm had ceased to represent Mr. Goldman in 2019. Also, Mr. Goldman wrote to Mrs. Barrera about an hour after being notified that Mr. Lee was withdrawing his offer and asked to get things back on track, while expressing he would accept Mr. Lee's terms. He also called the firm of Ferraiouli, LLC to try to revive negotiations. Yet, at the same time, he was and following up with Mr. Grzan and asking him to sign the revised Option.

Mr. Grzan responded at 12:39 and, in response to Mr. Goldman's pressure for an answer, or else he would proceed with the other buyers –which, again, was a lie, for they had withdrawn the offer the day before, Mr. Grzan informed him they would pull out of the deal. He expressed that 3.7 million was pushing their budget too hard, considering the expenses they would have to incur to renovate the Property and so forth. He then told Mr. Goldman to feel free and pursue the other offer. To make sure that Mr. Goldman understood they were pulling out of the deal and that he was free to pursue the other offer, Mr. Grzan reiterated the withdrawal in a follow up email. Mr. Grzan had no idea that the other deal had fallen through.

Mr. Goldman called Mr. Grzan that night, and they spoke briefly, but never did Mr. Goldman say the prospective buyer had withdrawn his offer. They spoke again the

following morning, and Mr. Grzan reiterated they did not want to buy the Property. Mr. Goldman responded then by saying that the other buyer was having money trouble and had too many contingencies. After the call, and without any request or petition from Mr. Grzan, Mr. Goldman sent him an email stating the following:

> Trying to make this happen. I was greedy and should have been more appreciative. To pay for my foolishness, I will sell my home for $50,000 less. 3.2, that is a sweet heart deal! let's put this back on track and use Adam's attorney/team to make this happen! Thank you Adam for putting up with my greedy behavior. But it was hard to say no an offer came in all cash for 3.7.

> This is meant to be your home JM and now your better half will have $50,000 more to improve your home. Please let me know what you all are thinking. You can make more money, not more time! Building in PR is not easy.

Mr. Grzan responded to the email and asked if Mr. Goldman could go as low as $3,150,000, so he could convince his wife to get back on board. After multiple exchanges and modifications to the Option, the parties finally reached an agreement and signed the Option on October 23, 2020. The purchase price was set at $3,150,000, payable with a good faith deposit of $200,000, and the balance on the closing date. The term for exercising the option was 30 days, expiring on November 23, 2020. The parties agreed that Time was of the essence, for Mr. Goldman would use the funds to fund another time sensitive project. In that regard, Mr. Grzan was given the option to extend the deadline by 30 days, in the final version, provided he paid directly to Mr. Goldman $600,000 and the $200,000 in escrow, before the 30-day deadline expired. Those $800,000 would be applied to the purchase price at closing.

At no point during this process of negotiating the Option was Mr. Grzan, in any way, directly or indirectly, ever advised or represented by anyone at Ferraiouli, LLC. The

only work an attorney for Ferraiouli, LLC did for Mr. Grzan prior to October 23, 2020, was the creation of TPC, task that did not involve the exchange of any information relating to Mr. Goldman or his Property. Similarly, prior to signing the Option on October 23, Mr. Grzan did not know who was behind the $3,750,000 offer. Mr. Goldman never revealed it. Neither that Ferraiouli had been the Firm representing Mr. Lee. And of course, prior to October 23, 2020, Mr. Grzan never spoke with Mr. Lee regarding their bids to purchase Mr. Goldman's house. Thus, there never was and never have been a conspiracy between Mr. Grzan, Mr. Lee or anyone at Ferraiouli to defraud or obtain any advantage from Mr. Goldman.

Wherefore, the Option signed on October 23, 2020, was the result of an arm's length negotiation, and thus, a valid contract. No cause intervened that would allow this Court to annul the Option. As the facts demonstrate, once the $3,750,000 offer came in and Mr. Grzan realized he had signed an expired Option, he and his wife decided to pull out of the negotiations, telling and reiterating to Mr. Goldman in unambiguous terms to proceed and accept the other offer, that Mr. Goldman expressed to them that he still had. That other offer, however, had been withdrawn because Mr. Goldman's unreasonable terms, and it was then that Mr. Goldman sought Mr. Grzan and, because he had been "greedy," voluntarily lowered the price and ultimately accepted $3,150,000. But more, if anyone negotiated in bad faith, it was Mr. Goldman, who, after having agreed to sell the property to Mr. Grzan for $3,250,000, continued to seek other offers behind Mr. Grzan's back.

### ii. After the Option was Signed

After the Option was signed on October 23, Mr. Grzan began to work towards a closing before November 23, 2020. The first thing that was resolved was the signing of the escrow agreement and the payment of the $200,000 good faith deposit. Mr. Grzan complied with that obligation. Then, Mr. Carbonell, who took over the process, sent the parties a list of tasks that needed to be completed in order to close. Also, Mr. Goldman's accountant, Rey Ríos, got involved, and he began to work out tax issues. Finally, Mr. Grzan assigned the Option to TPC, and provided Mr. Carbonell all the information necessary so TPC would appear as purchaser in the transaction.

By this time, though, Mr. Godman began to express concerns with his belongings that were still in the property and that he wanted to remove. So that this would not be an excuse, Mr. Grzan offered Mr. Goldman several solutions and agreed to be flexible so that Mr. Goldman would have time to remove his belongings after the closing. Mr. Grzan even went out of his way to recommend a neighbor of Dorado who could handle the move, but Mr. Goldman never contacted him. In fact, Mr. Goldman never coordinated the removal of his belongings in the property. Never. He, at times, was also slow in responding to request, like, for example, completing the Power of Attorney; obtaining necessary information, as the Homeowner Dues owed to Dorado Beach Estates, etc.; and in responding to or joining preschedule telephone conferences. As to the Power of Attorney, Mr. Goldman did not complete the process and sent the required document in time for closing on November 23, 2020, despite him knowing that it needed to be sent with many days in advance because it had to be protocolized, which would take a couple days. Sending it one or two days before November 23rd would not be adequate to close

on November 23rd. This supports the inference that his intent was on forcing the extension of the Option so he could receive the $800,000 he desperately wanted for his other project. Then, when the title study came in, it was discovered that Gerald Kleis, the individual who gave Mr. Grzan and Dr. Khimani access to the Property, had filed a complaint against Mr. Goldman for unpaid agent fees and recorded in the Registry a notice of lis pendens. This created an issue and became an obstacle to the closing on the initial 30 days. For one, the Title company declined to issue insurance and Mr. Kleis did not want to remove the notice unless he got paid. Although many alternatives were considered and explored, none would allow Mr. Goldman to provide clean title before November 23, 2020, particularly when he did nothing to resolve that issue. He did not care that prevented the transaction from going forward. So, given the circumstances, Mr. Grzan had no alternative but to agree to extend the Option.

### iii. The extension of the Option

As stated before, Mr. Grzan reserved the right to extend the Option provided he paid directly to Mr. Goldman the $200,000 deposited in escrow and an additional $600,000, for a total of $800,000, before the November 23, 2020, deadline. Well, November 23rd was a Monday, and Mr. Goldman sent the wire information in the afternoon of the preceding Friday, which did not provide sufficient time for anyone to wire the funds in time. But not only that, he provided the wrong information. Mr. Grzan went to the bank in good faith on Monday, November 23rd, but was unable to complete the transaction because Mr. Goldman provided incorrect information. But to make sure he complied with his obligation, Mr. Grzan wired the $600,000 to the escrow agent, to show his good faith and until they could correct the wire information. The fact that the funds

did not arrive on November 23rd is thus attributable to Mr. Goldman, only. Nevertheless, once the information was corrected, the funds were wired to Mr. Goldman and he accepted them without any reservations, curing the delay.

### iv. After the Payment of the $800,000

Because the Complaint filed by Mr. Kleis against Mr. Goldman was preventing the latter from providing clean title, Mr. Grzan offered to pay whatever Mr. Kleis was demanding so he could purchase Mr. Goldman's property. Mr. Kleis accepted the offer, and the required documents were prepared. The agreement, however, was subject to the closing of the transaction.

After that, Mr. Carbonell, notary chosen to authorize the transaction, worked on all the documents and by December 2, 2020, most were ready. On that date, he sent to Mr. Goldman a copy of the final draft of the Deed of Purchase –where TPC appeared as purchaser—and asked that he review it or share any questions he may have. He never answered. Other emails were sent which required Mr. Goldman's attention and review of documents. But Mr. Goldman never answered. In essence, after receiving the $800,000, Mr. Goldman stopped cooperating. For example, he was asked several times to review final documents and he never did. Even Mr. Ríos, his attorney in fact, wrote to him on December 12 and told everyone was waiting on him to close, but he did nothing. Then, he tried to create an issue with tax withholdings, but the matter was resolved by December 16. So, everyone was ready to close on the week of December 16 and the only reason the closing did not take place was because Mr. Goldman refused to do so. He refused to authorize his attorney in fact, Mr. Rey Ríos, to close. This, even after Mr. Ríos, his own CPA, had given the green light to the transaction and even after Mr.

Carbonell pleaded with him to close, stating so many people had put a lot of effort into the transaction.

Because Mr. Goldman refused to cooperate and close, Mr. Grzan sought the services of an attorney. He chose the firm of Ferraiouli, LLC because they had assisted him in the creation of the Trust and TPC. Nothing relating to Mr. Goldman nor Mr. Lee had anything to do with choosing that Firm. Plus, as Mr. Goldman had mentioned once, that Firm had ceased to represent him in 2019. So, an attorney from the litigation department, Mr. Jean Vidal-Font, sent a letter to Mr. Goldman on December 18, 2020, informing that everyone was ready to close and that all that remained was his indication that he would. The attorney also advised Mr. Goldman that, if he failed to close, Mr. Grzan would pursue legal action.

The letter appeared to be a great excuse for Mr. Goldman. Since the attorney worked for Ferraiouli, LLC, and said Firm had represented him before, and Mr. Lee as well, he concocted this conspiracy theory to get out of the Option. Nevertheless, Mr. Goldman lacks evidence to prove that Mr. Grzan, Ferraiouli, LLC and Mr. Lee conspired to defraud him. Similarly, even if Ferraiouli, LLC incurred in some form of conflict of interest, which we believe it did not, that has nothing to do with the validity of the Option. The Option was negotiated by Mr. Grzan in good faith, and the only persons that assisted him in the process were his friend Mr. Long and, for some aspects of securing the transaction, Mr. Carbonell.

Despite the controversy, Mr. Grzan continued to reach out to Mr. Godman and tried to offer alternatives so he would close. So did Mr. Long, who held a long conversation with Mr. Goldman about the matter. But the efforts were fruitless. During

the conversation with Mr. Grzan, Mr. Goldman would turn violent, and threaten Mr. Grzan by saying "I will destroy you and your wife's reputation;" "I will use social media to put in bad reviews about her;" "I know people in the Island, and you better not mess with me." About a week later, negative reviews about Dr. Khimani appeared in two sites. What is interesting, though, is that Dr. Khimani had not treated patients for more than a year when those reviews appeared. And the last posted reviews were dated three years before. Also, in response to complaints about time and the passing of a longtime friend, Mr. Grzan offered Mr. Goldman to extend the deadline of the Option, but Mr. Goldman refused, saying "I know what you want, you want me to put something in writing and I will not". Mr. Goldman made similar threats to Mr. Long, but, when Mr. Long asked him what it would take for him to close, Mr. Goldman responded by saying "more money".

Without options, TPC was forced to file the Complaint of Caption.

## 3. Final Points

Mr. Goldman's theory that Mr. Grzan, Ferraiouli, LLC and Mr. Lee conspired to defraud him is unavailing. He has no evidence to prove it. The fact that the firm of Ferraiouli, LLC represented him back in 2017-2019 –for a matter completely unrelated to the sale of his property, represented Mr. Lee and then Mr. Grzan is no evidence of a conspiracy. Similarly, even if Ferraiouli, LLC incurred in a conflict of interest, which we believe it did not, that conflict has nothing to do with the validity of the Option. It does not go to the fundamental elements of the Option. For that same reason, neither was Mr. Grzan required to inform Mr. Goldman that Ferraiouli, LLC had also done work for him on matters unrelated to the Property. What law firm has done work in the past for an individual is not one of the objects negotiated in an option to purchase a hose. Neither is

the cause of such a transaction. The Option was therefore negotiated by Mr. Grzan in good faith, and the only persons that assisted him in the process were his friend Mr. Long and, for legal aspects of the transaction, Mr. Carbonell, the Notary. Despite this being reality, Mr. Goldman refuses to close. And the reason, he wants more money. That is all.

Moreover, Mr. Goldman's argument that he was not obligated to sell, and that all he was required to do was return the $800,000 is simply an admission that that was his intention all along. In addition, the theory is unsupported by the terms of the Option. First, it was he who inserted the obscure clause he pretends to rely on to get out of his obligation to sell the property. Consequently, it should be interpreted against him. Second, the language of the clause is sufficiently broad to allow the interpretation that, in case seller failed to close, Mr. Grzan could seek specific performance –as this is an equitable remedy—and have the $800,000 returned as penalty.

So, TPC requests that the Court issue an order instructing a third party to sign the Deed of Sale and transfer title of the Property at Mr. Goldman's expense. Similarly, TPC asks that Mr. Goldman be ordered to pay TPC all the rental income it lost as a result of refusing to comply with his obligation to transfer title of the Property, amount that is calculated at $35,000 a month beginning on April of 2021 and continuing until title of the Property is transferred. TPC also asks that the Court order payment of three additional months in prospective rent for the time it will take to rent the Property once title is transferred, because of the time that has been waisted due to Mr. Goldman's willful breach of contract. In the alternative, TPC asks that Mr. Goldman pay the damages it has suffered as a result his failure to comply with his contractual obligation to transfer title

of the Property, damages that are estimated at $8,160,000.  Last but not least, payment of costs and a reasonable amount of attorney's fees are requested as well.


B. **Mr. Grzan and Dr. Khimani:**

Mr. John M. Grzan and Dr. Namrata Khimani are of legal age, married and residents of. Dorado, Puerto Rico. Mr. Grzan and Dr. Khimani moved to Puerto Rico with their family about 3 years ago.  During the year 2020, they were interested in looking at a bigger home for their family and a neighbor of Mr. Grzan, Mr. Adam Long, introduced him to Mr. Alan Bram Goldman. Mr. Long told him that Mr. Goldman owned a real estate property in Dorado Estates next to his and that he was interested in selling it. Mr. Grzan told Mr. Long that he might be interested in Mr. Goldman's property and arrangements were made with realtor Gerald Kleis to look at the property.  Afterward, Mr. Grzan worked through Mr. Long to reach an agreement with Mr. Goldman to purchase the property at $3,250,000.00. Mr. Long provided Mr. Grzan a template of an option to purchase agreement that he had used in a previous transaction. Mr. Grzan used that template to send a signed contract over to Mr. Goldman for $3,250,000.00 At all relevant times, the negotiations between Mr. Grzan and Mr. Goldman were conducted over the phone or thru emails exchanged between them. Mr. Grzan waited for Mr. Goldman to send back a signed contract as he indicated he would, but Mr. Goldman stalled as he negotiated with another potential buyer.  Finally, on October 20th, Mr. Grzan was blindsided when Mr. Goldman told him another offer had come in at $3,750,000.00 from Mr. Hyung Lee. Mr. Goldman acted like the offer came out of nowhere, despite engaging in negotiations with Mr. Lee's representative for several days while simulatenously telling Mr. Grzan they had

a deal and mentioning nothing of it to him. Mr. Goldman offered Mr. Grzan the opportunity to match the higher price. Mr. Grzan, not wanting to relive the previous experience of coming to agreement and Mr. Goldman backing out, asked for a signed contract from Mr. Goldman to consider.  Mr. Goldman finally delivered the signed contract 1 day later in the evening of October 22nd.  Having a suspicious opinion of dealing with Mr. Goldman from the previous interaction and thrown off by a suddenly higher purchase price, Mr. Grzan and his wife were left with a sudden, difficult, and emotional decision to make.   Mr. Goldman had put an expiry on the contract for 11:59pm on October 21st.   After being asked the following morning of October 22nd 2020 by Mr. Goldman if he was moving forward, Mr. Grzan abruptly signed the contract and sent it back not realizing it had expired. Almost immediately though, Mr. Grzan realized the contract had expired and immediately notified Mr. Goldman of it and requested another one to consider. Mr. Goldman eventually sent another contract back with an expiry in a couple hours by 11:59am October 22nd 2020 and telling Mr. Grzan to let him know or he will proceed with other buyers. Mr. Grzan and Dr. Khimani ultimately decided this was not the right purchase for them and informed Mr. Goldman that they were withdrawing from the process and he was free to pursue the other buyers he had mentioned.  Mr. Lee decided not to purchase the property on October 22nd 2020 as his attorney cited conditions proposed by the seller.   Consequently, Mr. Goldman reached back out to Mr. Grzan and tried to lure him back in despite Mr. Grzan telling him they were not interested. Eventually to get them back in, Mr. Goldman preemptively dropped his asking price to 3.2 million on the morning of October 23rd 2020.  Mr. Goldman's play worked and they eventually agreed on an Option to Purchase agreement at $3,150,000.00.   Pursuant to the contract signed,

the parties agreed to the following: a) Mr. Goldman would sell the property located at The Estates # 13, Dorado PR 00646 to Mr. John M. Grzan and his wife Namrata Khimani or their designated assignee; b) for the price of $3,150,000.00, thru a "cash sale"; c) a good faith deposit of $200,000.00 was to be placed in escrow with the closing agent, Title Security Group, LLC; d) closing was to take place on or before November 23, 2020-but could be extended by the buyer for an additional 30 days with a cumulative payment directly to Mr. Goldman of $800,000.00 which included the $200,000.00 in escrow and an additional $600,000.00.    The deal was not able to be closed by the initial date of November 23rd as Mr. Goldman failed to bring clean title due to a lawsuit brought against him by realtor Gerald Kleis for not paying him commission on the sale of the property or deliver other required materials such as his Power of Attorney in a timely manner. As a result, Mr. Grzan arranged for $600,000.00 to be sent to Mr. Goldman along with the escrow account releasing another $200,000.00 to extend the contract to December 23rd, 2020. After sending Mr. Goldman the $800,000.00, Mr. Goldman's uncooperativeness shifted to an even higher, extreme level where despite continued efforts to bend over backwards for him by Mr. Grzan, notary Carbonell, his accountant and the closing agents, Mr. Goldman became incredibly unresponsive.  Numerous emails were sent regarding items that needed Mr. Goldman's attention to which he never replied. He would continuously come up with various excuses to not close.   At times when he was urged to respond and close by Mr. Grzan, things would take a darker turn as Mr. Goldman would become malicious and threatening attempting to bully Mr. Grzan and Dr. Khimani out of the deal.  Mr. Goldman would threaten that if they pursued the closing, he would ruin their reputations through online slander, that he would have federal agents come and harass

and investigate their businesses, and to be careful because he knew many powerful people in Puerto Rico. When Mr. Long attempted to mediate, Mr. Goldman repeated these threats to him.  Sadly, he followed through on these threats as shortly after Teal Peak Capital LLC filed its claim against Mr. Goldman, Dr. Khimani began receiving negative reviews online despite having not practiced in nearly a year and not receiving any reviews for nearly 3 years. Additionally, both Mr. Grzan and Mr. Long received threatening messages and phone calls that caused them to fear for their livelihoods and the safety of them and their family.   Mr. Goldman even refused to close after Mr. Grzan offered to pay at closing, the $31,500.00 claimed from Mr. Goldman by Mr. Gerald Kleis Pasarell in State Court. After incredible efforts and realizing that Mr. Goldman was not intent on closing, Mr. Grzan was compelled to have Ferraiouli, LLC send on his behalf a letter to Mr. Goldman on December 18th, 2020 stating Teal Peak Capital LLC was intent on closing, everything was in place to do so, and they would pursue legal means if necessary. Since the letter came from Ferraiouli LLC, this gave Mr. Goldman a great opportunity to make another wild excuse for not closing claiming that there was a conflict of interest because Ferraiouli had represented him in the past in a dispute over trees with his neighbor, Mr. Grzan in the negotiation, and Mr. Lee.   This was another desperate move as Ferraiouli did not represent Mr. Grzan in the negotiation or take part in the negotiation in any way, Mr. Goldman's representation with Ferraiouli had long ended back in 2018, and Mr. Grzan only became aware that Mr. Lee's offer had come from Ferraiouli once Mr. Goldman told him after receiving the letter on December 18th 2020.  Mr. John M. Grzan and Dr. Namrata Khimani hold that Mr. Goldman acted in bad faith, that he never was really committed to close, and that he simply used the sale of the property as

a means to raise the $800,000.00 he needed to meet his financial obligations in the State of Vermont. Lastly, Mr. John M. Grzan and Dr. Namrata Khimani affirm that they never hired the law firm of Ferraiuoli, LLC to do any work whatsoever related to negotiating the purchase of Mr. Goldman's property, nor that they knew that Ferraiouli, LLC had presented Mr. Goldman the offer made by Mr. Lee for $3,750,000.00, which he was more than happy to accept despite the fact that he already had an agreement with them to close at $3,250,000.00.

## C. **Mr. Goldman**:

Alan Bram Goldman ("Mr. Goldman"), who happens to have various medical conditions such as cancer, cardiovascular issues, seizures, loss of vision, losing one kidney, losing half a bladder, losing part of his prostate, losing his belly button, PTSD and various skin conditions, owns a property located in The Estates #13, Dorado, Puerto Rico 00646 (the "Property"). The Property was built in the 1980s by Mr. Goldman's mom and has been his family's home for over four generations. In 2012, Mr. Goldman lost both of his parents and the Property was passed to their estate to be equally divided amongst Mr. Goldman and his siblings. Mr. Goldman's siblings wanted the Property sold, but Mr. Goldman did not agree as the Property was (and is) the embodiment of his late mother. As such, on or around February 2014, Mr. Goldman decided to buy the Property from his siblings. Throughout the years, Mr. Goldman received various offers for the Property which were rejected as he had no intention of selling his ancestral home.

In or around June 2017, Mr. Goldman's neighbor trespassed into the Property and cut down certain trees which were invaluable to Mr. Goldman. Mr. Goldman's neighbor

also planted an aggressive and invasive plant within a protected 10-foot easement in violation of the Bylaws of The Estates, which caused additional damages to the Property. As a result, in or around January 2018, Mr. Goldman hired Ferraiuoli LLC to represent him. During its representation of Mr. Goldman, attorneys from Ferraiuoli LLC acquired inside information regarding the Property, such as its market value, and Mr. Goldman's health conditions. Ferraiuoli LLC's representation of Mr. Goldman ended sometime in the fall of 2018.

On or around February 2020, Mr. Goldman signed an agreement to buy 100 acres in Vermont. The purchase was to be funded from the rental income of Goldman's business and the sale of three (3) of his properties, if required. Shortly after the execution of the agreement, however, the COVID-19 lockdown came into effect and Mr. Goldman suddenly found himself without the funds needed to complete the purchase and spent months trying to come up with the money with no avail. Mr. Goldman had until, on or about, November 19, 2020 to fund the purchase.

In September 2020, Mr. Goldman received several unsolicited offers for the Property, which were rejected. As the lockdown continued with no immediate end in sight, Mr. Goldman became desperate for money. In October 2020, Mr. Goldman's neighbor, Adam Long ("Mr. Long") introduced Mr. Goldman to Mr. Grzan. Said introduction led to an offer of $3,250,000.00 for the Property and the exchange of an Option to Purchase Agreement presumably prepared by Attorney Miguel Carbonell, who ended up being the notary public for the parties. Mr. Long had offered to buy Mr. Goldman's home in 2019 for $2,500,000. Mr. Goldman rejected the unsolicited offer. Mr. Long then purchased the

property next door for $2,500,000. Within a year Mr. Long flipped the property and sold it to another purchaser for $10,500,000 for a multi-million dollar profit.

The draft of the Option to Purchase Agreement ("Draft Option Agreement") sent to Mr. Goldman contained a clause addressing what would happen in the event of purchaser's default. *See* Id. Bates AG 08, Clause 14 ("In the event Purchaser, after exercise of the Option granted herein, fails to proceed with the closing of the purchase of the Property pursuant to the terms and provisions contained herein, Seller shall be entitled to retain the Option Fee as liquidated damages and shall have no further recourse against Purchaser"). Because Mr. Goldman wanted a similar clause in the event that he opted not to proceed with the sale of the Property, he relied on Mr. Grzan to add said clause to the Draft Option Agreement on his behalf. In response, Mr. Grzan added the following clause to the Draft Option Agreement on behalf of Mr. Goldman: "In the event Seller, after exercise of the Option granted herein, fails to proceed with the closing of the sale of the Property pursuant to the terms and provisions contained herein, Purchase [sic] shall be entitled to receive back the Option Fee and pursue any equitable remedies under the law." Mr. Goldman is not a lawyer and understood that the language and intent behind said clause was for Mr. Goldman to have the right to retain the Property and opt out of the Option Agreement, for whatever reason - before or after the option was exercised by the purchaser - by returning the Option Fee and paying any additional costs and expenses to which the purchaser might be entitled as a form of equity relief. For that reason, the right to seek specific performance by the purchaser in the event of Mr. Goldman's refusal to proceed with the sale was not included in the Draft Option Agreement.

While the Draft Option Agreement was being negotiated Mr. Goldman received an unsolicited offer from Hyung Soon Lee, who Mr. Grzan happens to know, to buy the Property for $3,750,000.00. Mr. Lee was represented by Ferraiuoli LLC. Mr. Goldman, in good faith, notified Mr. Grzan of this offer and that Ferraiuoli LLC was representing the potential buyer. Mr. Goldman also informed Mr. Grzan of his history with Ferraiuoli LLC. Finally, Mr. Goldman gave Mr. Grzan an opportunity to match the offer, which the latter did.

As part of the new terms between the parties, Mr. Grzan had until 11:59 PM, Puerto Rico time, of October 21, 2020 to execute the written Option Agreement in order to formalize the contract. Mr. Grzan and Dr. Khimani sent to Mr. Goldman a signed option agreement minutes after the deadline. Then many hours later communicated to Mr. Goldman that they changed their minds and told him to consider the executed option agreement null and void. On October 22, 2020, Mr. Grzan also told Mr. Goldman that he was no longer interested in moving forward with the option and told Mr. Goldman that he could pursue a deal with other potential purchasers, including Mr. Lee. That same day Ferraiuoli LLC withdrew the $3,750,000 offer they had extended on behalf of Mr. Lee, without any explanation.

Surprised by Mr. Lee's withdrawal and under heavy pressure and duress to obtain the funds needed to close the purchase of the Vermont property, Mr. Goldman reoffered the Property to Mr. Grzan for the discounted price of $3,200,000.00. Mr. Grzan agreed to buy the Property for $3,150,000 and Mr. Goldman agreed. On October 23, 2020, the Option Agreement was executed between Mr. Grzan and Ms. Namrata Khimani, and Mr. Goldman at 11:57 PM.

In December 2020, a few weeks before the scheduled closing of the Property, Mr. Goldman was dealing with several problems in Vermont. Namely, one of his developments lost heating capabilities. This proved to be a hassle (and a serious liability) for Mr. Goldman, as many of his tenants were without heat during winter. Also, Mr. Goldman was notified of a deficiency in his taxes due to an accounting error. Because of these circumstances, Mr. Goldman was unable to keep track of his emails for several days, including those related to the Option Agreement and the Closing Statement sent by the individuals working on Mr. Grzan's behalf.

On December 18, 2020, Mr. Goldman received a demand letter (via email) from Ferraiuoli LLC. Through the same, Mr. Goldman found out that Mr. Grzan concealed a crucial piece of information: that Ferraiouli LLC represented him and Teal Peak Capital, LLC. If Mr. Goldman would have known, he would not have signed the Option to Purchase Agreement. Understandably, Mr. Goldman was upset as this fact made a mess of the closing of the sale of the Property and caused him to believe that it was a tactic to force him to sell his Property for less than a reasonable price. As such, Mr. Goldman called Mr. Grzan and explained to him that if it was not for Mr. Grzan's concealment of Ferraiouli LLC's representation, he would have closed by the December 23, 2020 deadline. But, because Ferraiouli LLC was involved, a firm that had a history with Mr. Goldman, he needed to obtain his own legal representation to assess his options. Mr. Goldman also informed Mr. Grzan that his beloved friend, Mrs. Carmen Cividanes, had died unexpectedly of a heart attack. Mrs. Cividanes was like a mother to Mr. Goldman. Mr. Goldman asked Mr. Grzan to please wait until after Three Kings Day so that he and

Carmen Josefina Cividanes could peacefully mourn the death of Mrs. Cividanes. Instead, Mr. Goldman was sued the eve of Christmas Eve.

## III.     Brief Factual Statement of Controversies

### A. TPC:

1. The Option signed between Grzan-Khimani and Mr. Goldman on October 23, 2020 is a valid contract.  It suffers none of the ailments established in the Civil Code of Puerto Rico of 1930 that may allow this Court to declare it null and void.

2. Clause 15 of the Option is a penal clause, and broad enough in its terms to allow the Purchaser, in the event of Seller's default, to seek specific performance and also keep the security deposit as penalty for the default.

3. In the alternative, Clause 15 of the Option is broad enough in its terms to allow the Purchase, in the event of Seller's default, to seek specific performance of the Contract.

4. Because Clause 15 is unclear and ambiguous, it should be interpreted against Mr. Goldman.  It was he who drafted it and included it in the Option.  The original draft of the Option, which was sent by first by Mr. Adam Long, and signed by Grzan-Khimani, did not have a clause dealing with seller's default.  The Clause appeared for the first time in the draft that Mr. Goldman sent back to Mr. Long.

5. At no time, prior to October 23, 2020, was Grzan-Khimani advised nor assisted in any way by anyone at the firm of Ferraiouli, in the process of negotiating the Option signed with Mr. Goldman.  Neither did Grzan-Khimani, prior to October 23, 2020, ever discuss with anyone at the firm of Ferraiouli that they were thinking of or negotiating to purchase Mr. Goldman's property at #13 Dorado Beach Estates.  Last, Mr. Grzan or

TPC were in no obligation to inform Mr. Goldman that the firm of Ferraiouli, LLC had provided services to him. That is not a matter that goes to the elements of the Option.

6. At no time, prior to October 23, 2020, did Grzan-Khimani know that Mr. Hyung Lee was also bidding to buy Mr. Goldman's property in Dorado Beach Estates.

7. At no time did Grzan-Khimani interefered with or got involved, neither directly nor indirectly, in Mr. Hyung Lee's process of negotiating or withdrawing from negotiations to purchase Mr. Goldman's property at #13 Dorado Beach Estates.

8. Sometime after signing the Option, Grzan-Khimani assigned the Option to TPC, assignment that was not forbidden in the Option.

9. In the execution of their obligations under the Option, Grzan-Khimani and TPC acted diligently and in good faith and complied with all of its terms and conditions.

10. Nothing attributable to Grzan-Khimani and TPC contributed to or prevented the execution of the Deed of Purchase whereby Mr. Goldman would sell to TPC his property at #13 Dorado Beach Estates.

10. In the execution of his obligations under the Option, Mr. Goldman acted in bad faith, by failing to be diligent and cooperate with the parties to make sure the Deed of Sale would be executed on or before December 23, 2020, as agreed. Mr. Goldman, in fact, failed to comply with the terms of the Option and sell his property at #13 Dorado Beach Estates to TPC.

11. TPC is entitled to specific performance. In the alternative, to damages, consisting of lost rent based on $35,000 a month, beginning in April of 2021; or no less than $8,000,000.

**B.  Mr. Grzan and Dr. Khimani:**

Mr. Grzan and Dr. Khimani adopt by reference TPC's version of the factual statement of controversies.

**C.  Mr. Goldman:**

1. Teal Peak Capital, LLC and Mr. Grzan concealed Ferraiuoli LLC's legal representation, which warrants the avoidance of the Option Agreement due to dolus.

o As a corollary, should the Court deny the above: Clause 15 of the Agreement is a penal clause that should be adjusted. *See* In re Alvarez, 473 B.R. 853, 861 ("'Precisely because of' their coercive and punitive purpose, penal clauses in Puerto Rico are 'subject to the principle of moderation' under Puerto Rico law. 'As a remedy in equity against the strictness or the excessive burden of the penal clause, the Civil Code [of Puerto Rico] provides for the mitigation of the penalty' in 31 L.P.R.A. § 3133 Article 1240 of the 1930 Puerto Civil Code, 31 L.P.R.A. § 3133").

2. Clause 14 and 15 of the Option Agreement limits the remedies available in case of any of the parties' default and it does not include specific performance as a valid remedy.

3. The intention of the parties was not to include specific performance as a remedy in Clause 14 and 15 of the Option Agreement.

4. If Clause 15 is unclear and unambiguous it should not be interpreted against Mr. Goldman as he did not draft the clause. Notably, Clause 15 is a copy of Clause 14 which was already included in the original draft of the Option Agreement, which was not drafted by Mr. Goldman.

5. Mr. Goldman had valid reason not to close the sale of the Property.

6. The Option Agreement expired by its own terms on December 23, 2020.

## IV.  **Applicable Law**

### A.  **TPC**:

Before we dive into the heart of the matter, it is imperative to highlight certain unquestionable premises. First, because this Court sits in diversity jurisdiction and the parties did not provide otherwise in the *Option to Purchase Agreement*, the substantive law applicable to the controversy at hand is that of the Commonwealth of Puerto Rico. *Cochran v. Quest Software, Inc.*, 328 F.3d 1 (1st Cir. 2003) ("It is elementary that a federal court sitting in diversity jurisdiction must borrow the substantive law of the forum state.") citing, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  Second, the *Option to Purchase Agreement* entered between the parties is governed by the provisions of the Civil Code of Puerto Rico that regulate obligations and contracts in general. See, *Media Holdings, Inc. v. Aerco Broad Corp.,*852 F. Supp. 2d 189 (1st Cir. 2012) (The Supreme Court has consistently recognized that the general rules regarding contracts and obligations are applicable to options contracts) citing *Rosa Valentín v. Vázquez Lozada*, 3 P.R. Offic. Trans. 1115, at 4; 103 DPR 796, 804 (1975) see, also, *Pritchard v. Norton*, 106 U.S. 124, 129–130, (1882) ("[W]hatever goes to the substance of the obligation and affects the rights of the parties, <u>as growing out of the contract itself or inhering in it or attaching to it</u>, is governed by the law of the contract.") (Our emphasis.) Third, the provisions that govern the Agreement entered between the parties are those of the Civil Code of 1930, for the document was signed on October 23, 2020, a month before the Civil Code of 2020 came into effect.

Based on these undisputed premises, the *Option to Purchase Agreement* entered between the parties must be interpreted in accordance with Puerto Rico Law, and, consequently, "growing out of the [*Agreement*] itself or inhering in it or attaching to it" are all the provisions and remedies that govern obligations and contracts in general. *Pritchard*, 106 U.S. at 129-130. *Media Holdings, Inc. v. Aerco Broad Corp.,* 852 F. Supp. 2d 189 (1st Cir. 2012) (The Supreme Court has consistently recognized that the general rules regarding contracts and obligations are applicable to options contracts) citing *Rosa Valentín v. Vázquez Lozada*, 3 P.R. Offic. Trans. 1115, at 4This is axiomatic, and unless stated otherwise, all remedies provided by the provisions that govern obligations and contracts in general –the Civil Code-- are inherent in the contract, without any need of formal expression.

To form a valid contract under Puerto Rico's law, both parties must consent, have a definite object which may be the subject of the contract and a cause for the obligation which may be established. See, P.R. Laws Ann. Tit. 31, sec. 3391. Contracts are perfected by mere consent, and from that time they are binding, not only with regards to the fulfilment of what has been expressly stipulated, but also with regards to all the consequences which, according to their character, are in accordance with good faith, use, and law. See, P.R. Laws Ann. Tit. 31, sec. 3375. The consent of the contracting parties "is shown by the concurrence of the offer and acceptance of the thing that the cause which are to constitute the contract". See, P.R. Laws Ann. Tit. 31, sec. 3401. Provided they are not in contravention of law, morals or public order, the contracting parties may make the agreements and establish the clauses and conditions which they may deem advisable. See, P.R. Laws Ann. Tit. 31, sec. 3372.

It is well established –under Puerto Rican law— that if "the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed." Article 1233 of the Civil Code; 31 LPRA sec. 3471. "Under Puerto Rican law, an agreement is 'clear' when it can 'be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation....'" *Borschow Hosp. and Medical Supplies, Inc. v. Cesar Castillo Inc.*, 96 F.3d 10, 15 (1st Cir. 1996). However, when the words used "appear contrary to the evident intention of the contracting parties, the intention shall prevail." *Id.* To judge the intention of the parties, Article 1234 mandates that "attention must principally be paid to their acts, contemporaneous and subsequent to the contract." 31 LPRA sec. 3472. In these circumstances, the matter becomes one for the trier of facts. *Sylva*, 389 F.Supp.2d at 193. See, also, *Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d 173, 178 (1st Cir. 1995) ("the interpretation of [ambiguous] contract language, itself acknowledged, becomes a question of fact for the jury rather than a question of law for the judge") citing *In re Newport Plaza Assocs.*, 985 F.2d 640, 645 (1st Cir.1993).

Once the contract is perfected, the obligations arising from the same "have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations". See, P.R. Laws Ann. Tit. 31, sec. 2994. This is known as the principle of *pacta sunt servanda. William L. Bonnell Co. v. Gandara*, 714 F. Supp. 2d 272 (D.P.R. 2010) ("Furthermore, the doctrine of *pacta sunt servanda* generally holds parties to strict compliance with the terms of their bargain").

Now, implicit in any bilateral obligation is the right to demand specific performance and/or damages as established in Article 1077 of the Civil Code. Article 1077, in pertinent part, states:

> The right to rescind the obligations is considered as implied in mutual ones, in case one of the obligated persons does not comply with what is incumbent upon him. The person prejudiced may choose between exacting the fulfilment of the obligation or its rescission, with indemnity for damages and payment of interest in either case. He may also demand the rescission, even after having requested its fulfilment, should the latter appear impossible.

31 LPRA § 3052.

The right to pursue specific performance or damages as provided by Article 1077 grows out or is inherent in any option to purchase agreement, because although such contracts are unilateral in nature, once the optionee exercises the option granted, the obligation becomes bilateral and the right to pursue specific performance is borne. That is exactly what the Supreme Court of Puerto Rico clarified in *Rosa Valentín*:

> In this manner, the declaration which implies the exercise of the option transforms the unilaterally connecting promise into synallagmatic. As of this moment any of the parties may require performance of the reciprocal obligations, obligations to make, which consist in executing the final contract.

3 P.R. Offic. Trans. at 1131.

> See, also, *P.D.C.M. Assoc. v. Najul Bez*, 174 DPR 716 (2008) (Granting plaintiff's demand for specific performance of an option to purchase agreement after the option was timely exercised and the defendants refused to close on the sale of the property).

Because the right of any party to file these actions in the event of a default is inherent in any contract governed by the provisions of the Civil Code, for a court to bar a contracting party from exercising such rights, said party must have necessarily

exonerated the other from future defaults or waived those rights. Article 4 of the Civil Code states that "[r]ights granted by the laws may be renounced, provided such renunciation be not contrary to law, to public interest or public order, or prejudicial to the interest of a third person." Interpreting this Article, the Supreme Court of Puerto Rico has stated that in our system of laws, clear, conclusive, and unequivocal language in the contract is necessary for the renunciation of rights authorized by Article 4 of the Civil Code to be effective, especially when it comes to agreements in which one party is exonerated from responsibility for future acts. *Chico v. Editorial Ponce, Inc.,* 1 P.R. Offic. Trans. 1036; 101 D.P.R. 759 (1973). See, also, *Alvarado Aviles v. Burgos*, 601 F.Supp. 29 (D.P.R. 1984) ("The Supreme Court of Puerto Rico has held that "clear and explicit language is required in the contract to absolve a person from the consequences of his own conduct.") Furthermore, agreements exempting a party from liability are not favored by the law and, consequently, should be interpreted strictly and against the party that rests on such renunciations to free itself from responsibility. *Chico*, 1 P.R. Offic. Trans. at 1058 ("It is a universally accepted rule that agreements exempting from liability for negligence are not favored by the law; [citations omitted] and should therefore be strictly construed against the party relying on them to avoid liability, and, if possible, their interpretation should be against exemption.") citing *Cabrera v. Doval*, 76 D.P.R. 777, 781 (1954).

Based on these tenets, to determine whether a specific clause exempts a party from the consequences of his own conduct, the Court must determine whether the waiver is clear, conclusive, and unequivocal. It must also ascertain "(1) whether the parties' intent was clear; and (2) whether the waiver is contrary to the law, the public interest, or the

public order, or prejudicial to the interests of a third person." See, *Sylva v. Culebra Dive Shop*, 389 F.Supp.2d 189, n. 3 (D.P.R. 2005) citing to *Chico*, supra and Cabrera, supra.

**Nullity of Contracts**

The consent and the contract expressing such consent enjoy a presumption of validity. *Unisys P.R., Inc. v. Ramallo Bros. Printing, Inc.*, Official Trans., 128 DPR 842 (1991). Under Puerto Rican law, the consent shall be void if "given by error, under violence, by intimidation, or deceit". See, P.R. Laws Ann. Tit. 31, sec. 3404. According to the Civil Code, there is deceit or "dolus" "when by words or insidious machination the part of one of the contracting parties the other is induced to execute a contract without them he would not have made." See, P.R. Laws Ann. Tit. 31, sec. 3408. To determine the existence of deceit or "dolus" that would void the consent, the Court must consider a person's education, his social and economic status, his relations and the type of business in which he is engaged in. *Miranda Soto v. Angela Men*a, Official Trans., 109 D.P.R. 473 (1980) To prove deceit or "dolus", "the intentional fault or bad faith of the person charged must be established, inasmuch as good faith is always presumed." Citibank, N.A. v. Dependable Ins. Co., Official Trans., 121 D.P.R. 503 (1998). Last, for deceit or "dolus" to give rise to the nullity of a contract "it must be serious, and must not have been employed by both of the contacting parties." See, P.R. Laws Ann. Tit. 31, sec. 3409.

**B. <u>Mr. Grzan and Dr. Khimani</u>:**

**<u>Option to Purchase Agreements</u>**

Under Puerto Rico law, "obligations arising from contracts have legal force between the contracting parties and must be fulfilled in accordance with their stipulations." 31 P.R. Laws Ann. § 2994. Therefore, contracts are law between the parties. 31 P.R.

Laws Ann. § 2994; *Treco, Inc. v. Marina de Palmas, Inc.*, 626 F. Supp. 335, 342 (D.P.R. 1986).

"The option to purchase contract is not regulated by the Civil Code, but this jurisdiction has recognized its existence. It is a consensual contract through which one party (promisor) grants the other party (optionee) the exclusive right to unilaterally decide whether to purchase specific real property belonging to the promisor. This power must go toward the eventual execution of a purchase and sale contract. Its essential elements are: (1) the optionee is granted the power to unilaterally decide whether to execute the principal (purchase and sale) contract without any obligation on his or her part; (2) this grant of power is exclusive in nature; (3) a term is set for exercising the option; and (4) there is no other condition than the will of the optionee." *Irizarry López v. García Camara,* 2001 TSPR 161.

"We can infer from these factors that although the option to purchase is a consensual contract, it as unilateral, inasmuch as the optionee is under no obligation to purchase, while the promisor has the obligation to sell to the optionee if the latter so decides. "[c]ontract[s] exist[] from the moment one or more persons consent to bind himself or themselves, with regard to another or others, to give something or to render some service." *Irizarry López v. García Camara,* 2001 TSPR 161.

Civil Code sec. 1213 provides that for a contract to be valid, three elements must concur: consent, object, and cause [consideration].

Civil Code sec. 1210 provides: Contracts are perfected by mere consent, and from that time they are binding, not only with regard to the fulfilment of what has been

expressly stipulated, but also with regard to all the consequences which, according to their character, are in accordance with good faith, use, and law.

"We have held that contracts have force of law between the parties, who must fulfill what was accorded as long as it does not contravene the law, morals or public order as provided in the cited statute." *Irizarry López v. García Camara,* 2001 TSPR 161.

### Good Faith

According to Article 15 of Puerto Rico's Civil Code all rights shall be exercised and fulfilled in good faith. 31 P.R. Laws Ann §5334. Good faith is a general requirement of our Law and, as such, it extends to our whole legal system. *Velilla v. Pueblo Supermarkets, Inc.,* 111 D.P.R. 585 (D.P.R. 1981) (Official Trans. at 1981 PR Supp. LEXIS 160). "The ethical content of each act should be examined in the light of its particular circumstances, but a behavior based on good faith is a general rule that encompasses every judicial activity". *Id.* In *Producciones Tommy Muñiz, Inc. v. Panamericanos Copan*, 113 D.P.R. 517 (D.P.R. 1982) (Official Trans. at 1982 PR Sup. LEXIS 236) the Supreme Court of Puerto Rico recognized that preliminary negotiations "generate a social relationship that imposes on the parties the duty to act in good faith, which, as Díez-Picazo has correctly observed, 'does not only govern legal relationships already established, but also those derived form a simple social contract'". As a result, an unjust withdrawal or termination from the precontractual phase of negotiations may result in liability. To determine if an interruption of negotiations was unjustified or arbitrary the courts must examine the circumstances of the interruption, such as, the development of the negotiations, how did they begin, their course, the conduct of the parties throughout them, the sage at which the interruption took place and the parties' reasonable

expectation to form a contract, as well as any other relevant circumstances under the fact of the case submitted to judicial scrutiny. *Id.* Also, the analysis to solve the case should bear in mind what legal concept – fault, dolus, fraud, good faith, abuse of law or other general principle of law— is the most adequate. *Id.*

## C. <u>Mr. Goldman</u>:

Mr. Goldman's statement of legal theory is based on two distinct pillars: i) the Option to Agreement ("Option Agreement" o "Option to Purchase Agreement") executed between the parties clearly and with specificity establishes the remedies available to the purchasers and seller in case of default and ii) the deceit by insidious machinations (*dolus*) employed by Teal Peak Capital, LLC and Mr. John-Michael Grzan which directly influenced Mr. Goldman's consent when he entered into the Agreement.

### i) *First Pillar: The Agreement is the Law between the Parties*

Foremost, Article 10 and 11 of the 1930 Puerto Rico Civil Code dictate that Puerto Rico law is applicable in this case. *See* 31 L.P.R.A. § 10 ("Personal property is subject to the laws of the nation of the owner thereof; real property to the laws of the country in which it is situated"); 31 L.P.R.A. § 11 ("The forms and solemnities of contracts, wills and other public instruments are governed by the laws of the country in which they are executed"). When a Court intervenes in contractual relations, it should balance the legal interests affected by its intervention. *See* <u>Coop. Sabanena v. Casiano Rivera</u>, 184 D.P.R. 169, 181-82 (2011). Furthermore, as a part of its analysis, the Court must consider the doctrine of contractual autonomu, which governs contractual relations. *See* <u>Coop. Sabanena v. Casiano Rivera</u>, 184 D.P.R. at 182. The Court, in exercising its power to intervene and moderate the contractual autonomy of the parties, must exercise extreme

care and its intervention must be clearly justified "because of its harmful effects on the stability of contracts and on legal certainty." López de Victoria v. Rodriguez, 113 D.P.R. 265, 271, 13 P.R. Offic. Trans. 341, 349 (1982). This is so because, intervening with the autonomy of the parties has the effect of modifying, or even annulling what is considered the law between the parties. See Coop. Sabanena v. Casiano Rivera, 184 D.P.R. at 182. Indeed, "contracts have force of law between the parties, who must fulfill what was accorded as long as it does not contravene the law, morals or public order . . ." S.L.G. Irizarry v. S.L.G. Garcia, 155 D.P.R. 713, 725, 2001 WL 1555664, P.R. Offic. Trans. (2001); See also 31 L.P.R.A. § 2994. Moreover, our rules on contract interpretation require that "[i]f the terms of the contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed." S.L.G. Irizarry v. S.L.G. Garcia, 155 D.P.R. at 725 (quoting 31 L.P.R.A. § 3471).

Plaintiff is seeking specific performance and wants to formalize the sale of the Property. To ascertain whether specific performance is an adequate remedy in this case, Clause 15 of the Option Agreement should be the crux of this Court's analysis. Clause 15 of the Option Agreement states that

> In the event Seller, after exercise of the Option granted herein, fails to proceed with the closing of the sale of the Property pursuant to the terms and provisions contained herein, Purchase shall be entitled to receive back the Option Fee and pursue any equitable remedies under law.

This clause was drafted and accepted by Mr. Grzan upon Mr. Goldman's request. The language and intent behind said clause was to grant Mr. Goldman the right to retain the Property and opt out of the Option Agreement, for whatever reason - even after the option

was exercised - by returning the Option Fee and paying any additional costs and expenses to which the purchaser could be entitled as a form of equity relief. The right to seek specific performance in the event of Mr. Goldman's refusal to proceed with the sale of the Property was not incorporated in Clause 15.

Plaintiff has argued, and this Court has agreed, that specific performance is a form of equitable remedy. We sustain that this is the case in common law courts. In courts subject to the civil code tradition, however, as is the case with Puerto Rico, the term *equitable remedies* has a specific definition and scope, which excludes the specific performance of a contract.

Equitable remedies in Puerto Rico are grounded on Article 7 of the 1930 Puerto Rico Civil Code. *See* 31 L.P.R.A. § 7. Article 7 states that "**[w]hen there is no statute applicable to the case at issue**, the court shall decide in accordance with equity, which means that natural justice, as embodied in the general principles of jurisprudence and in accepted and established suages and customs, shall be taken into consideration." Article 7 allows the courts to fill *gaps* in the law. *See* CMI Hospital v. Depto. Salud, 171 D.P.R. 313, 324 (2007). However, when another provision of law applies, there is no gap to fill. *Compare,* In re Méndez García, 2014 WL 1464850, pg. *7 (Bankr. D.P.R. April 15, 2014)("It is clear that the doctrine of one's own acts must not be applied if the matter can be resolved using applicable statutes. As there is vast statutory authority applicable to the controversy at hand, the doctrine of one's own acts will not be used"). Notably, in our case, the exact opposite happens as Clause 15 details the applicable law and the remedies available in case of party default. *See* Ojeda v. Morales Torres, KLAN2000800229, 2008 WL 5429870 at page *7 (TA PR, November 26, 2008) (if the

parties regulated the regal relationship they have contractually created, there will be fewer gaps that will have to be addressed by the Civil Code); *see also* S.L.G. Irizarry v. S.L.G. Garcia, 155 D.P.R. 713, 725, 2001 WL 1555664, _____ P.R. Offic. Trans. _____ (2001) ("contracts have force of law between the parties, who must fulfill what was accorded as long as it does not contravene the law, morals or public order. . ."); Article 1044 of the 1930 Civil Code, 31 L.P.R.A. § 2994. Moreover, because equitable remedies, as defined by Article 7 of the 1930 Civil Code, apply only when there is no statute applicable to the case at issue, they are inapposite in the present case. The Option Agreement is the law between the parties and it does not specify that specific performance is an available remedy in case Mr. Goldman defaults. As such, the Honorable Court cannot give Teal Peak Capital, LLC in equity (Article 7) a remedy to which it would have been expressly entitled at law had he not limited it by agreeing to Clause 15 of the Option Agreement. *See* CMI Cap. Mkt. Inv., LLC v. Municipality of Bayamon, 410 F. Supp. 2d 61, 76 (D.P.R. 2006) ("The doctrine of one's own acts flows from Art. 7 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 7 (1993), which allows the court to interject equity principles in the absence of a specific applicable legal provision").

Simply put, the Option Agreement does not afford Teal Peak Capital, LLC the right to (i) seek specific performance of the sale of the Property or (ii) recover consequential damages for loss of rent, income or other profit on the Property, if Mr. Goldman exercised his rights under Clause 15. Teal Peak Capital, LLC's only available remedies are to recover the deposit of $800,000 and any additional costs and expenses incurred in connection with the Option Agreement as a form of equity relief, such as any closing fees and attorney's fees accrued during the closing of the sale of the Property. Mr. Goldman

never intended for the term *equitable remedy* used in Clause 15 to refer to specific performance. Otherwise, Mr. Goldman would have never signed the Option Agreement.

   *a. In the alternative, Clause 15 is ambiguous as to the parties' intent; therefore, this Court must explore and determine what the parties intended in Clause 15[1]*

Pursuant to Article 1233 of the Puerto Rico Civil Code, if "the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed." 31 L.P.R.A. § 3471. However, if the words used in a contract "appear contrary to the evident intention of the contracting parties, the intention shall prevail." Id. To ascertain the intention of the contracting parties, Article 1234 of the Puerto Rico Civil Code dictates that "attention must principally be paid to their acts, contemporaneous and subsequent to the contract." 31 L.P.R.A. § 3472.

Mr. Goldman affirms that Clause 15 limited the remedies afforded to the purchaser if the closing did not take place. Teal Peak Capital, LLC, however, sustains that Clause 15 is ambiguous as the words used in the Option Agreement appear contrary to his intent. *See* Docket No. 80, p. 8 ("Clause 15 can be understood in more than one sense, leaving room for doubt, controversies and/or differences of interpretation"). If that were to be the case, the claimed ambiguity of Clause 15 would add further support to Mr. Goldman's contention that the term equitable remedies was not meant to include specific performance. What constitutes an equitable remedy is a difficult enough subject for attorneys and law commentators, much less for a lay person like Mr. Goldman who was not represented by counsel when he executed the Option Agreement.

---

[1] *See* Plainttif's Response in Opposition to Defendant's Motion to Dismiss Plaintiff's Amended Complaint, Docket No. 80, p. 8.

If, as Teal Peak Capital, LLC and Mr. Grzan claims, Clause 15 is ambiguous, then, as drafter of Clause 15, said ambiguity must be interpreted against Teal Peak Capital, LLC. *See* 31 L.P.R.A. § 3478 ("The interpretation of obscure stipulations of a contract must not favor the party occasioning the obscurity"); *see also* <u>Century Packing Corp. v. Giffin Specialty Equip. Co., LLC</u>, 438 F.Supp.2d 16, 29 ("Clearly such lack of clarity or omission cannot be allowed to benefit GIFFIN since it was the party that drafted the contract"). Thus, the Court must find against Teal Peak Capital, LLC and hold that the term *equitable remedies* used in Clause 15 does not include the right to seek specific performance on the sale of the Property.

Lastly, if Teal Peak Capital, LLC or Mr. Grzan argue that Mr. Goldman's interpretation of Clause 15 is inconsistent with the basic and essential elements of an option contract, then the Option Agreement should be rendered null. The essential elements of an option contract are:

> (1) the optionee is granted the power to unilaterally decide whether to execute the principal (purchase and sale) contract without any obligation on his or her part; (2) this grant of power is exclusive in nature; (3) a term is set for exercising the option; and (4) there is no other condition than the will of the optionee.

<u>S.L.G. Irizarry v. S.L.G. Garcia</u>, 155 D.P.R. 713, 2001 WL 1555664, _____ P.R.  Offic. Trans. _____ (2001). Mr. Goldman is not a lawyer and understood that the language and intent behind Clause 15 was for Mr. Goldman to have the right to retain the Property and opt out of the Option Agreement, for whatever reason - before or after the option was exercised by the purchaser - by returning the Option Fee and paying any additional costs and expenses to which the purchaser might be entitled as a form of equity relief. Mr. Goldman's interpretation is inconsistent with the unilateral nature of the option

contract. *See* Id. ("It is a consensual contract through which on party (promisor) grants the other party (optionee) the exclusive right to unilaterally decide whether to purchase specific real property belonging to the promisor"). Also, Mr. Goldman's interpretation and intention is consistent with his acts, contemporaneous and subsequent to the Option Agreement. *See* 31 L.P.R.A. § 3472. But again, it was Mr. Grzan's drafting of Clause 15 which caused the obscurity and withered the unilateral nature of the Option Agreement. Because the executed Option Agreement does not meet the essential requirements of contracts of its nature, it must be declared null and void. *See* 31 L.P.R.A. § 3451 ("Contracts shall be binding, whatever may be the form in which they may have been executed, provided the essential conditions required for their validity exist").

    ii)      *Second Pillar: Ferraiuoli LLC's Involvement and Mr. Grzan's Silence*

    The Puerto Rican Civil Code establishes the following as it pertains to dolus: "[t]here is [dolus] when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which without them, he would not have made." 31 L.P.R.A. § 3408 (2006). Dolus, or the insidious machinations, may arise from acts or omissions from Plaintiff or Mr. Grzan. *See* Westernbank Puerto Rico v. Kachkar, 2009 WL 6337949 (D.P.R. 2009); P.C.M.E. Commercial, S.E. v. Pace Membership Warehouse, Inc., 952 F.Supp. 84, 92 (D.P.R. 1997). In turn, "[i]n order that [dolus] may give rise to the nullity of a contract, it must be serious, and must not have been employed by both of the contracting parties." 31 L.P.R.A. § 3409. Serious dolus is defined as that which "determines the consent of the parties . . ." P.C.M.E. Commercial, 952 F.Supp. at 92.

Mr. Grzan concealed that Ferraiuoli LLC was his legal representation since before he entered negotiations with Mr. Goldman. This concealment determined Mr. Goldman's consent as it pertains executing the Agreement with Mr. Grzan and Dr. Khimani.

In or around June 2017, Mr. Goldman's neighbor had trespassed into the Property and cut down certain sacred trees which were invaluable to Mr. Goldman. Mr. Goldman's neighbor also planted an aggressive and invasive plant with irrigation in a protected 10-foot easement in violation of the Bylaws of the Estates, which caused additional damages to the Property. In or around January 2018, Mr. Goldman hired Ferraiuoli LLC to represent him in this matter. As a result, Ferraiuoli LLC acquired inside information of the Property, such as its value.

In or around September 2020, through Mr. Adam Long, Mr. Grzan approached Mr. Goldman. It is at this time that Mr. Goldman told Mr. Grzan of the incident that occurred around June 2017 and how his neighbor trespassed his Property and cut down sacred trees. Mr. Goldman informed Mr. Grzan of Ferraiuoli LLC's representation on the matter and how vulnerable he was due to him being isolated, heavily medicated, and recovering from various medical conditions such as cancer, losing one kidney, losing half a bladder, losing part of his prostate, losing his belly button, PTSD and various skin conditions. At that time, Mr. Grzan did not disclose that Ferraiuoli LLC was his legal representation (not limited to the negotiations to buy the Property).

On October 18, 2020, Mr. Goldman received an unsolicited offer from Mr. Hyung Soon Lee, who Mr. Grzan happens to know, to buy the Property for $3,750,000.00. Mr. Lee was represented by Ferraiuoli LLC. Mr. Goldman, in good faith, notified Mr. Grzan of this offer and how Ferraiuoli LLC was representing the buyer. He wanted to give Mr.

Grzan an opportunity to match the offer, which he did. After working on various drafts for most of the day, an agreement was reached and approved by both parties. But Mr. Grzan knowingly sent the offer late which rendered it ineffective. Again, at this time, Mr. Grzan did not disclose that Ferraiuoli LLC was his legal representation.

Two days later, on October 22, 2020, without any justification whatsoever, Ferraiuoli LLC withdrew the lucrative offer from Mr. Lee. With the foregoing in mind, one day after Mr. Lee and Ferraiuoli LLC withdrew the offer, on October 23, Mr. Grzan, Dr. Khimani, and Mr. Goldman executed the Agreement, through which Mr. Grzan and Dr. Khimani, were given an exclusive option to purchase the Property for $3,150,000.00: $600,000 less than Mr. Lee's offer which, again, was spear-headed by Ferraiuoli LLC.

It was not until December 18, 2020, a few days before the deadline to close the Property, that Mr. Goldman became aware that Ferraiuoli LLC represented Mr. Grzan and Teal Peak Capital, LLC. Understandably, Mr. Goldman was upset as this fact made a mess of the closing of the sale of the Property. As such, Mr. Goldman called Mr. Grzan and explained to him that if it was not for Mr. Grzan's concealment of Ferraiouli LLC's representation, he would have closed by the December 23, 2020 deadline. But, because Ferraiouli LLC was presumably involved, a firm that had a history with Mr. Goldman, he needed to obtain his own legal representation to assess his options. Mr. Goldman's reaction to Ferraiuoli LLC's probable representation of Mr. Grzan and Teal Peak Capital, LLC was intensified by Mr. Goldman's medical conditions and medications.

To make matters worse, Mr. Goldman was notified of a grave loss four days later. His neighbor in Puerto Rico, Mrs. Carmen Cividanes had died terribly of a heart attack. Mrs. Cividanes was like a mother to Mr. Goldman. Mr. Goldman asked Mr. Grzan to

please wait until after Three Kings Day so that he and Carmen Josefina Cividanes could peacefully mourn the death of Mrs. Cividanes. Then, they could sort out the mess created by him and Ferraiuoli LLC. Before Mr. Goldman could hire any legal representation or mourn the death of Mrs. Cividanes, he was sued.

## V.  UNDISPUTED FACTS

With leave of Court, the parties propose to submit a list of undisputed facts by November 2, 2022.

## VI.  WITNESSES

### A. TPC:

1. <u>John Michael Grzan</u>: Mr. Grzan will testify about how he got interested in Mr. Goldman's property; the process of negotiating the Option; how Mr. Goldman negotiated in bad faith and breached the initial agreement; the fact that no one, ever, at Ferraiouli; LLC assisted him in that process; that he had no idea Hyung Lee was also bidding on the Property; that he bent over backwards to accommodate Mr. Goldman; that he complied with all of his obligations under the Option, including agreeing to settle Gerald Kleis lawsuit at closing; and that ultimately, Mr. Goldman willfully and in bad faith breached the agreement.  Moreover, he will testify about the threats Mr. Goldman made when they tried to come to terms with him, including threats to post negative reviews online of his wife, who is a medical doctor.

2. <u>Adam Long</u>:  Mr. Long will testify about introducing Mr. Grzan to Mr. Goldman; how he assisted both in the process of negotiating the transaction; the obstacles he witnessed Mr. Goldman raise; how he tried to negotiate with Mr. Goldman so he would close, and how, in response, Mr. Goldman threatened him and told him that he would only close if they gave him more money.

3. <u>Miguel Carbonell-Astor:</u>  Mr. Carbonell was the notary who oversaw the entire process of preparing the closing.  He will testify about the tasks he performed and how Mr. Goldman was uncooperative, to the point of either waiting to the last minute to produce required information to finally ignoring requests for approval of closing documents.  He will also testify that, in his view, Mr. Goldman acted in bad faith and had no valid reason to refuse to close.

4. <u>Rey Ríos</u>:  Mr. Ríos was Mr. Goldman's CPA and designated attorney in fact.  He was hired to deal with tax issues for Mr. Goldman and serve as attorney in fact to close the

transaction. He will testify to the effect that he completed his work on time for the parties to close by the week of December 15, but that he was never authorized by Mr. Goldman to close.

5. <u>Namrata Khimani</u>: Dr. Khimani is the wife of Mr. Grzan. She will testify about the difficulties she had with her husband when Mr. Goldman went back on his word and demanded more money for the Property. She will also testify about the negative reviews posted on two separate sites a week after Mr. Goldman threatened her husband with doing just that.

**TPC reserves the right to call any witness announced by Mr. Goldman in this Joint Proposed Pretrial Order. Specifically, plaintiff reserves the right to call these witnesses, announced by defendants, to cover any matter not addressed in their respective direct examinations, if necessary.

## B. <u>Mr. Grzan and Dr. Khimani:</u>

At the trial of this action, counter defendants expect to present the following witnesses:

1. John Michael Grzan. Address: 412 Dorado Beach East, Dorado PR 00646. Tel.: 914-924-4988. Mr. Grzan will testify about how he got interested in Mr. Goldman's property; the process of negotiating the Option; how Mr. Goldman negotiated in bad faith and breached the initial agreement; the fact that no one, ever, at Ferraiouli; LLC assisted him in that process; that he had no idea Hyung Lee was also bidding on the Property; that he bent over backwards to accommodate Mr. Goldman; that he complied with all of his obligations under the Option, including agreeing to settle Gerald Kleis lawsuit at closing; and that ultimately, Mr. Goldman willfully and in bad faith breached the agreement. Moreover, he will testify about the threats Mr. Goldman made when they tried to come to terms with him, including threats to post negative reviews online of his wife, who is a medical doctor.

2. Namrata Khimani. Address: 412 Dorado Beach East, Dorado PR 00646. Tel.: 914-924-4988. Dr. Khimani is the wife of Mr. Grzan. She will testify about the difficulties she had with her husband when Mr. Goldman went back on his word and demanded more money for the Property. She will also testify about the negative reviews posted on two separate sites a week after Mr. Goldman threatened her husband with doing just that.

**John M. Grzan and Namrata Khimani reserves the right to call any witnesses announced by defendant and counter claimant in this Joint Proposed Pretrial Order. Specifically, John M. Grzan and Namrata Khimani reserves the right to call these

witnesses, announced by plaintiff, to cover any matter not addressed in their respective direct examinations, if necessary.

## C.  Mr. Goldman:

*Mr. Goldman hereby reserves his right to not call the witnesses at the trial. The following list should not be construed to mean that Mr. Goldman's intent is to call the witnesses with certainty.*

1. Mr. Alan Bram Goldman – Mr. Goldman will testify about the context behind his decision-making and how said context affected his though processes. Mr. Goldman will also testify how he felt cheated when Teal Peak Capital, LLC and Mr. Grzan concealed that Ferraiouli LLC had represented them before the negotiations of the Option Agreement. Teal Peak Capital, LLC's and Mr. Grzan's concealment of Ferraiouli LLC's representation made a mess out of the closing of the Property. If it was not for the concealment, Mr. Goldman would have closed before the deadline to do so. Mr. Goldman is also prepared to testify about his intention and understanding of Clause 14 and Clause 15 and the exclusion of specific performance. Mr. Goldman will testify about all his health and business issues.

2. Mr. John-Michael Grzan – Defendant will call Mr. Grzan to ask about all of his communications with Mr. Goldman though email or otherwise. Mr. Grzan will also be called to ascertain Ferraiouli LLC's involvement in the negotiations of the Option Agreement and the closing of the Property. Mr. Grzan will also be asked to explain why he did not disclose Ferraiouli LLC's representation when Mr. Goldman disclosed his history with said firm.

3. Mr. Miguel Carbonell-Astor – Defendant will ask Mr. Carbonell about the drafts of the Option to Purchase Agreement, about the preparation of the closing documents, and the time they were finally forwarded to Mr. Goldman for their review. He will also be asked to testify about his conversations with Mr. Goldman and Mr. Grzan before the closing date.

4. Mr. Adam Long – Mr. Long will be called to testify about his conversations he had with Mr. Goldman and Mr. Grzan before and after the negotiations and closing date of the sale of the Property.

5. Mr. Rey Rios – Mr. Rios will be called to testify about his involvement in the closing of the sale of the Property. He will also testify about how he had no knowledge of the escrow agreement between the buyers and Mr. Kleis even though he had the power of attorney to close the sale of the Property. He will also testify about his communications with Mr. Goldman, Mr. Carbonell, and the other parties.

## VII.     DOCUMENTARY EVIDENCE

## A. TPC:

## Exhibits:

### Documents

| # | Description | Date |
|---|-------------|------|
| 1 | First draft of Option to Purchase Agreement – Sent by Mr. Long | October 9, 2020 |
| 2 | Second draft of Option – signed by Mr. Grzan | October 13, 2020 |
| 3 | Third draft of Option – sent by Mr. Goldman to Mr. Long | October 18, 2020 |
| 4 | Signed Option | October 23, 2020 |
| 5 | Final draft of Deed of Purchase | December 2, 2020 |

### E-mails

**Mr. Long (Long) and Mr. Grzan (JM)**

| | Date | From | To | Description | Bates No. |
|---|------|------|-----|-------------|-----------|
| 6 | 10/9/2020 | Long | JM | Forward Kleis Contact | AL 01 – AL 02 |
| 7 | 10/9/2020 | Long | JM | Forward First Draft of Option attached. | AL 03 – AL 08 |
| 8 | 10/14/2020 | JM | Long | Signed Draft of Option attached. | AL 12 - AL 16 |
| 9 | 10/14/2020 | Long | Goldman/ JM | Intro to JM and forward of Sign Option attached. | AL 017 - AL 018 AG 06 – AG 08 |
| 10 | 10/18/2020 | Goldman | Long-JM | Revised Option by Goldman, attached. | AL – 019 - AL – 020 |

**Mr. Grzan (JM) and Mr. Goldman (Goldman)**

| | Date | From | To | Description | Bates No. |
|---|------|------|-----|-------------|-----------|
| 11 | 10/19/2020 | JM | Goldman | JM email to Goldman recapping previous phone call. | AG – 017 |
| 12 | 10/20/2020 | Goldman | JM | Another offer. JM's response. | AG – 018 - AG – 019 |
| 13 | 10/21/2020 | Goldman | JM | Draft of Option with new price. | AGM 1126 – AGM 1130 |

| 14 | 10/21/2020 | JM | Goldman | Errors in draft, send Option corrected and signed | AGM 0005 |
|----|------------|-----|---------|---------------------------------------------------|----------|
| 15 | 10/21/2020 | JM | Goldman | Corrected draft attached. | AGM 006-AGM 0010 |
| 16 | 10/21/2020 | Goldman | JM | Goldman sends JM signed contract. | AGM 1131-AGM 1135 |
| 17 | 10/22/2020 | JM | Goldman | JM sends signed Contract passed deadline | AGM 0012-AGM 0016 |
| 18 | 10/22/2020 | JM | Goldman | Informing Goldman that the contract returned is not valid; requests another valid contract. | AG – 033-034 |
| 19 | 10/22/2020 | JM | Goldman | JM confirms he received new contract, asks to review. | AG – 037 -AG – 038 |
| 20 | 10/22/2020 | JM | Goldman | JM emails Goldman to let him know he is out. | AG – 047 |
| 21 | 10/22/2020 | JM | Goldman | JM sends another confirmation email to Goldman that he is out. | AG – 048 |
| 22 | 10/23/2020 | Goldman | JM | Goldman to JM trying to make this happen; admitting he was greedy; agrees to sell home for $3.2 million, $50k less | AG – 053 |
| 23 | 10/23/2020 | JM | Goldman | Proof of funds after agreement. | AG 055 - AG – 056 |
| 24 | 10/30/2020 | JM | Goldman | JM to Goldman providing moving agent contact info. | AG – 091 |
| 25 | 11/4/2020 | JM | Goldman | JM to Goldman providing relocation agent and that he heard rumors the house is being shopped. | AG – 092 |
| 26 | 11/10/2020 | JM | Goldman, | Following up on POA; HOA letter and Kleis lawsuit; offering help on possessions | AG 095 -AG 096 |
| 27 | 11/11/2020 | JM | Goldman | JM email to Goldman on possessions encouraging getting it done but sympathetic. | AG – 0101 |
| 28 | 11/23/2020 | JM | Goldman | Settling Kleis lawsuit, contingent on closing | AG 0156 |
| 29 | 12/1/2020 | JM | Goldman | Email JM to Goldman next steps personal possessions. | AG – 0179 |

| 30 | 12/3/2020 | JM | Goldman | JM reaching out to Goldman. | AG – 0203 |
|----|-----------|----|---------|----------------------------|-----------|
| 31 | 12/3/2020 | JM | Goldman | Following up, no answer | AG 0203 |
| 32 | 12/6/2020 | JM | Goldman | JM trying to contact Goldman. | AG – 0204 |
| 33 | 12/7/2020 | JM | Goldman | JM to Goldman to do list hoop jumping. | AG – 0205 |
| 34 | 12/7/2020 | JM | Goldman | JM to Goldman reminding him on HOA. | AG – 0206 |
| 35 | 12/8/2020 | JM | Goldman | JM to Goldman trying to connect and get him to close. | AG – 02015 |
| 36 | 12/9/2020 | Closing Agent | Notary, JM, Goldman, Rios | Closing agent sending settlement figures to notary, JM, Goldman and Rios. | AG – 0220<br><br>AG – 0220 - AG – 0229 |
| 37 | 12/18/2020 | JM | Goldman | JM email to Goldman giving him heads up of lawyer letter. | AG – 0244 |
| 38 | 12/18/2020 | Ferraiuoli | Goldman | Ferraiuoli email to Goldman with letter they were sending. | AG – 0245 - AG – 0246 |
| 39 | 1/17/2021 | JM | Goldman | JM email reach out to Goldman. | AG – 0259 |

**Mr. Carbonell (Notary) and Mr. Grzan (JM)**

| | Date | From | To | Description | Bates No. |
|----|------|------|----|-------------|-----------|
| 40 | 10/27/2020 | Notary | JM/ Goldman | Email from notary with closing checklist. | AG – 089<br><br>From AG – 085 - AG – 089 |
| 41 | 10/28/2020 | JM | Notary | Teal Peak Capital Documents | MC 019 |
| 42 | 11/13/2020 | Notary | JM/Goldman | Title study and Draft of POA | AG 0102-AG 0105 |
| 41 | 11/23/2020 | Notary | JM, Goldman, RR, Closing Agent 1 [JMR Title] ("CA 1") | Notary email to JM, Goldman with incomplete items including POA. | AG – 0138 |

| | Date | From | To | Description | Bates No. |
|---|---|---|---|---|---|
| 42 | 11/23/2020 | JM | Goldman | Re: connecting Gerald with Title Company; Goldman's documents. | MC 0185 |
| 43 | 11/24/2020 | Gerald | JM | Summary of agreement. | MC 0195 - MC 0197 |
| 44 | 12/1/2020 | Notary | Goldman/JM | Scheduling upcoming closing; Draft of Deed of Colosing; TPC purchaser. | AG – 0180<br><br>AG – 0180 - AG – 0202 |
| 45 | 12/1/2020 | Notary | Goldman, RR | Re: scheduling upcoming closing; company's closing agents. | MC 0248 |
| 46 | 12/2/2020 | Notary | Goldman, RR, JM | Notary to Goldman with draft of deed of purchase for his and JM's review; confirm settlement agreement between Gerald and JM. | MC 0249 |
| 47 | 12/7/2020 | Notary | Goldman, JM | Escrow Agreement draft; following up on review of deed of purchase and sale. | MC 0252 - MC 0253 |
| 48 | 12/10/2020 | Notary | Goldman | Follow up on personal items | AG 0230-31 |
| 49 | 12/16/2020 | Notary | Goldman | Non-Resident Withholding Opinion; final settlement | AG 0232 – AG0239 |
| 50 | 12/17/2020 | Notary | Goldman, Ríos, Grzan, Donato | Please respond | AG 0240 |

**Rey Ríos and Mr. Goldman**

| | Date | From | To | Description | Bates No. |
|---|---|---|---|---|---|
| 51 | 12/12/2020 | R. Ríos | Goldman | Two options of settlement of closing | AGM 00447- AGM 00456 |

**Gerald Kleis and Mr. Grzan (JM)**

| | Date | From | To | Description | Bates No. |
|---|---|---|---|---|---|
| 52 | 1/24/2020 | Kleis | JM | details of agreement to settle | GK 013 - GK 016 |

**Goldman and Mrs. Barrera**

|    | Date             | From    | To      | Description                                                                                                    | Bates No.                          |
|----|------------------|---------|---------|----------------------------------------------------------------------------------------------------------------|------------------------------------|
| 52 | 10/17/2020       | Goldman | Barrera | PR photos pre-storm.                                                                                            | AGM – 01385                        |
| 53 | 10/17/2020       | Barrera | Goldman | Requesting floor plan.                                                                                          | AGM – 01386 - AGM – 01387          |
| 54 | 10/18/2020       | Goldman | Barrera | Needs to know if Mrs. Barrera's client is serious; requesting letter of intent; mentions that he is working with two other serious buyers | AGM – 00496 - AGM – 00497          |
| 55 | 10/18/2020       | Barrera | Goldman | KB's clients offer.                                                                                             | AGM – 00498 - AGM – 00504          |
| 56 | 10/18/2020       | Goldman | Barrera | Response to email from KB with her client's offer.                                                             | AGM – 01389 - AGM – 01390          |
| 57 | 10/19/2020       | Barrera | Goldman | Call you in 15.                                                                                                 | AGM – 01400 - AGM – 01401          |
| 58 | 10/19/2020       | Goldman | Barrera | Accepting KB client's offer; requesting confirmation from buyer.                                              | AGM – 00508 - AGM – 00509          |
| 59 | 10/20/2020       | Barrera | Goldman | Requesting information to prepare PSA.                                                                          | AGM – 01406 - AGM – 01409          |
| 60 | 10/20/2020       | Goldman | Barrera | Requesting P&S draft for review.                                                                               | AGM – 01410 - AGM – 01414          |
| 61 | 10/20/2020       | Barrera | Goldman | Sent the first draft of the P&S; contacted escrow agreement company.                                          | AGM – 00517 - AGM – 00521          |
| 62 | 10/20/2020       | Goldman | Barrera | Requesting call to work on a few details.                                                                      | AGM – 01415 - AGM – 01419          |
| 63 | 10/20/2020       | Goldman | Barrera | Following up on P&S.                                                                                            | AGM – 01420 - AGM – 01423          |
| 64 | 10/20/2020       | Goldman | Barrera | Requesting PSA for review; mentions other offers.                                                             | AGM – 01424 - AGM – 01427          |

| 65 | 10/20/2020 | Barrera | Goldman | Buyer is serious with going forward; tells Goldman he should receive the PSA later that day. | AGM – 00522 - AGM – 00525 |
|---|---|---|---|---|---|
| 66 | 10/20/2020 | Goldman | Barrera | Requesting DB PSA for review. | AGM – 01428 - AGM – 01446 |
| 67 | 10/20/2020 | Barrera | Goldman | Sharing first draft submitted to buyer; buyer is reviewing draft. | AGM – 00526 - AGM – 00535 |
| 68 | 10/20/2020 | Goldman | Barrera | Confirming receipt of draft; requesting meeting to discuss changes to move forward. | AGM – 00536 - AGM – 00541 |
| 69 | 10/20/2020 | Goldman | Barrera | Requesting to speak to someone, re: agreement. | AGM – 01447 - AGM – 01449 |
| 70 | 10/21/2020 | C. Rodriguez (Ferraiuoli) | Barrera | PSA with comments. | AGM – 00542 - AGM – 00557 |
| 71 | 10/22/2020 | Barrera | Goldman | KB sends email to Goldman with withdrawal of offer from her client. | AGM – 01452 - AGM – 01451 |
| 72 | 10/22/2020 | Goldman | Barrera | Goldman's email to KB, re: lets get this back on track; informing he has no issues with the changes from the attorney. | AGM – 01454 |
| 73 | 10/22/2020 | Goldman | Barrera | Karla are you there? | AGM – 01457  AGM – 01455 - AGM – 01457 |
| 74 | 10/22/2020 | Barrera | Goldman | keep me posted; might have other clients. | AGM – 01458 |

**Identification**:

**Documents**

| # | Description | Date |
|---|---|---|
| 1. | Healthgrade review of Dr. Khimani | December 29, 2020 |
| 2. | Vitals review of Dr. Khimani | December 31, 2020 |
| 3. | Vitals review of Dr. Khimani | December 31, 2020 |

**TPC reserves the right to use any document or exhibit on Mr. Goldman's ID or Exhibit list, any document offered by the other parties, any document used or relied on by any witness, any section of any transcript of any deposition taken in the case of caption for any use allowed under the Federal Rules of Civil Procedure and Federal Rules of Evidence, and any document for impeachment purposes or for any other permissible purpose under the Federal Rules of Evidence.

**TPC hereby reserves the right to amend its documentary evidence at any time prior to the end of trial.

**Mr. Goldman just produced the emails he exchanged with Mr. Long and, consequently, this party has not had a chance to review them.  That has prevented TPC from including those it deems important as part of its evidence.  TPC reserves the right to add to its document list once those documents are reviewed.

**TPC objects the admissibility of Mr. Goldman's identifications, for they were not produced during discovery, and they are hearsay.

## B. **Mr. Grzan and Dr. Khimani**:

Mr. Grzan and Dr. Khimani hereby adopt by reference TPC's list of exhibits and

identifications to be used at trial.

** Mr. Grzan and Dr. Khimani reserves the right to use any document or exhibit on Mr. Goldman's ID or Exhibit list, any document offered by the other parties, any document used or relied on by any witness, any section of any transcript of any deposition taken in the case of caption for any use allowed under the Federal Rules of Civil Procedure and Federal Rules of Evidence, and any document for impeachment purposes or for any other permissible purpose under the Federal Rules of Evidence.

**Mr. Grzan and Dr. Khimani hereby reserves the right to amend its documentary evidence at any time prior to the end of trial.

## C. **Mr. Goldman**:

**Exhibits**:

| # | Description | Date |
|---|---|---|
| A | Ferraiuoli LLC's Engagement Letter with Mr. Goldman. | January 9, 2018 |
| B | Mr. Goldman's Deposition | September 6, 2022 |
| D | Adam Long's Deposition | August 11, 2022 |
| E | Emails between Mr. Long and Mr. Grzan re: introduction of Mr. Goldman | October 9, 2020 |
| F | Draft of Option to Purchase Agreement for $3,250,000.00 | October 13, 2020 |
| G | Mr. Grzan's Deposition | September 8, 2022 |
| H | Email between Attorney Carbonell and Mr. Grzan re: the draft of the Option to Purchase Agreement regarding questions Mr. Grzan had about the draft of the Option to Purchase Agreement and the potential purchase of the Property. | October 12, 2020 |
| J | Attorney Carbonell's Deposition | August 10, 2022 |
| K | Executed Option to Purchase Agreement | October 23, 2020 |
| L | Mr. Lee's offer to purchase the Property. | October 18, 2020 |
| M | Withdrawal of Mr. Lee's offer. | October 22, 2022 |
| N | Email between Mr. Goldman and Mr. Grzan notifying Mr. Lee's offer. | October 20, 2022 |
| O | Mr. Grzan's matching of Mr. Lee's offer. | October 21, 2022 |
| P | Emails between Mr. Grzan and Mr. Goldman regarding Mr. Grzan's decision to no longer pursue the offer. | October 22, 2022 |
| Q | Emails between Mr. Goldman and Mr. Grzan regarding Mr. Grzan's acceptance of $3,150,000 deal. | October 23, 2020 |
| R | Emails between Mr. Goldman and Mr. Grzan showing that the Option to Purchase Agreement was executed. | October 23, 2020 |
| S | Ferraiuoli LLC's Demand Letter | December 18, 2020 |
| T | Email between Mr. Grzan and Mr. Goldman after the Complaint was filed. | January 17, 2021 |

**Identification**:

### **Documents**

| # | Description | Date |
|---|---|---|
| A | Fire Inspection Results of the Division of Fire Safety for the Vermont Department of Public Safety re: heating system failure in one of Mr. Goldman's developments. | 2020 |
| B | Closing date concerning Mr. Goldman's Vermont real estate deal. | November 16, 2020 |
| | | |

**Mr. Goldman also reserves the right to use any document or exhibit on TPC's ID or Exhibit list, any document offered by the other parties, any document used or relied on by any witness, any section of any transcript of any deposition taken in the case of caption for any use allowed under the Federal Rules of Civil Procedure and Federal Rules of Evidence, and any document for impeachment purposes or for any other permissible purpose under the Federal Rules of Evidence.

**Mr. Goldman also reserves his right to amend its documentary evidence at any time prior to the end of trial.

## VII.   DEPOSITIONS

The parties reserve the right to use any deposition taken in the case of caption for any use allowed under the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

## VIII.   LIST OF EXPERT WITNESSES

None.

## IX.   STATEMENT ABOUT CLAIMS OR DEFENSES THAT ARE DEEMED WAIVED OR ABANDONED

### A. TPC:

None on the part of TPC.

### B. Mr. Grzan and Dr. Khimani:

None on the part of Mr. Grzan and Dr. Khimani.

### C. Mr. Goldman:

Any damages are limited by the contract.

## X.   LIST OF ALL PENDING MOTIONS

None.

## XI. TRIAL TIME ESTIMATE

Five days.

## XII. TRIAL DATE AND SCHEDULING MATTERS

To be determined by Court.

## XIII. CONSENT TO PROCEED BEFORE A U.S. MAGISTRATE-JUDGE

The Parties have not agreed to proceed before a Magistrate Judge for trial.

**RESECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, on this 24th day of October 2022.

**WE HEREBY CERTIFY** that on this same date we presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send electronic notification of such filing to all counsel of record.

| | |
|---|---|
| **Attorney for Defendant, Goldman Bram Goldman** | **Attorneys for Plaintiff, TPC** |
| | **Sánchez-Betances, Sifre & Muñoz-Noya** |
| **McConnell Valdés LLC** | PO Box 364428 |
| PO Box 364225 | San Juan, PR |
| San Juan, Puerto Rico 00936-4225 | t. 787-756-7880 |
| 270 Ave. Muñoz Rivera | f. 787-753-6580 |
| Hato Rey, PR 0918 | |
| T: 787-250-5604 | *s/Adrián Sánchez-Pagán* |
| F. 787-759-8282 | Adrián Sánchez-Pagán |
| | USDPR NO. 223311 |
| s/Antonio A. Arias-Larcada | asanchez@sbsmnlaw.com |
| Antonio A. Arias-Larcada | |
| USDC-PR 204906 | |
| aaa@mcvpr.com | **Attorney for Mr. Grzan and Dr. Khimani** |
| | |
| s/José A. Irizarry-Castro | |
| José A. Irizarry-Castro | Héctor Eduardo Pedrosa Luna |
| USDC-PR 308803 | USDPR NO. 223202 |
| jic@mcvpr.com | **The Law Offices of Héctor E. Pedrosa Luna** |
| | PO Box 9023963 |
| | San Juan, PR 00902-3963 |

t. 787-920-7983
f. 787-754-1109

S/Héctor Eduardo Pedrosa Luna
Héctor Eduardo Pedrosa Luna
USDC-PR 223202
hectorpedrosa@gmail.com